Ed. Schuster & Company, Inc., Respondent, vs. Steffes, District Attorney, Appellant: Gimbel Brothers, Inc., and others, Intervening Defendants and Appellants.

Herzfeld-Phillipson Company, Respondent, vs. Same, Appellant: Same, Intervening Defendants and Appellants.

*September 10, 1940—March 11, 1941.*

42

For the appellant there was a brief by *O. L. O'Boyle,* corporation counsel of Milwaukee county, and oral argument by *John W. O'Boyle* of Milwaukee.

For the intervening appellants Wisconsin Retail Jewelers Association, Inc., Milwaukee Retail Furniture Dealers Association, and Gimbel Brothers, Inc., there were briefs by *Poss, Toelle & Schuler,* attorneys, and *Benjamin Poss* and *Joseph P. Brazy* of counsel, all of Milwaukee, and oral argument by *Mr. Brazy* and *Mr. Poss.*

For the intervening appellants Walter Raasch, Paul C. Janke, and Wisconsin Pharmaceutical Association there were briefs by *Mount & Zander,* attorneys, and *H. R. Neubauer* of counsel, all of Milwaukee, and oral argument by *Herbert L. Mount.*

For the respondents there were briefs by *Kaumheimer, Alt & Likert,* attorneys for the Ed. Schuster & Company, Inc., and *Lecher, Michael, Whyte & Spohn,* attorneys for the Herzfeld-Phillipson Company, attorneys, and *John S. Best* and *Daniel K. Hopkinson* of counsel, all of Milwaukee, and oral argument by *Mr. George H. Likert, Jr., Mr. Best, Mr. Kaumheimer,* and *Mr. Hopkinson.*

The following opinion was filed January 7, 1941:

WICKHEM, J. There are no substantial issues of fact involved in this case. The case involves the proper construction and the constitutionality of sec. 100.15 (2), Stats. This subsection provides as follows:

"The giving, offering, issuance or delivery of any trading stamp, token, ticket, bond, slip, check or other similar device having a redemption value, by any person, firm, corporation or association, in connection with the resale of any goods, wares or merchandise which were bought by such person, firm, corporation or association with knowledge or notice that the resale price thereof had been fixed or established by the producer or distributor thereof, when the price obtained on the resale less the total redemption value of the device herein mentioned given in connection therewith is below the fixed or established minimum price, is declared to be an unfair method of competition in business, and notwithstanding the provisions of subsection (1) of this section, or any other provision in the statutes, is prohibited. In addition to the penalty provided in section 100.26 for violation of this section, an injunction may be issued by any court of competent jurisdiction restraining further violation hereof at the suit of any person, firm or corporation damaged or affected thereby."

Plaintiffs, Ed. Schuster & Company,.Inc., hereinafter called "Schusters," and Herzfeld-Phillipson Company, hereinafter called the "Boston Store," have for many years operated department stores in the city of Milwaukee. Schusters have three such stores in outlying districts; the Boston Store is located in the central business district of the city. For more than fifty years Schusters have issued and redeemed cash-discount stamps for cash purchases of merchandise or prompt payment of credit accounts. For thirty-five years the Boston Store has engaged in similar practices. The intervening defendant Gimbel Brothers, Inc., is a competitor of plaintiffs and does not issue trading stamps in connection with its business.

Defendants Wisconsin Retail Jewelers Association, Inc., Retail Furniture Dealers Association, and Wisconsin Pharmaceutical Association, as well as defendants Raasch and Janke, who were druggists, are in certain respects competitors of plaintiffs or have members who are competitors, and so far as the record discloses none of these defendants issue or redeem trading stamps.

There are certain differences in mechanics between the Boston Store and Schuster systems, but in general each gives trading stamps with cash purchases or promptly paid credit balances. These stamps are redeemed in cash by the stores, and books are furnished to customers in which these stamps may be placed until a substantial number are collected. The stamps issued by Schusters bear on their face a stated cash value of one-half mill, and are issued at the rate of four for each ten-cent cash payment, constituting a discount of two per cent of the amount of the payment. They are issued two for each ten-cent payment of promptly paid credit accounts, instalment contracts, etc., constituting a discount of one per cent. The Boston Store stamps are of the cash value of one and two-thirds mills. They are issued at the rate of one for each ten-cent payment, whether cash or promptly paid credit accounts, and constitute a discount of one and two-thirds per cent on the payment, except that on Tuesdays two stamps are issued for each ten-cent payment and cash purchase and cash down payment, this being equivalent to a discount of three and one-third per cent. While it is customary to collect enough stamps to entitle the customer to the payments of one or two dollars, both stores redeem stamps in any amount capable of being paid for in cash or currency. Nearly all of the customers of these stores avail themselves of the stamps. It is the claim of the Boston Store and Schusters that these stamps merely furnish the mechanics for encouraging cash purchases and prompt payment of bills, and that they simply represent discounts for cash rather than underselling devices involving goods purchased.

The complaint of the stores not issuing stamps, which is claimed by defendants to have led the legislature to enact sec. 100.15 (2), Stats., was that the issuance of trading stamps on sales of articles which were the subject of fair-trade contracts amounted in effect to sales below the stipulated minimum price and defeated the purpose of the statute in authorizing and protecting such contracts. In other words, the nonstamp stores were required by the act not to sell goods purchased under fair-trade agreements below a stipulated minimum price, whereas the stamp merchants, although literally selling at the retail price stipulated, in effect undersold that price by giving the rebate involved in the redemption of stamps. The Fair Trade Act, sec. 133.25, Stats., so far as important here, provides:

"(3) Except as provided in subsections (4) and (6), no contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade-mark, brand or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others, shall be deemed a contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce by reason of any of the following provisions contained in such contract:

"(a) That the buyer will not resell such commodity except at the price stipulated by the vendor.

"(b) That the vendee or producer shall require that any person to whom delivery of a commodity is made for the purpose of resale shall agree that the latter will not, in turn, resell except at the price stipulated by the vendor or vendee.

"(4) Every contract containing the provisions referred to in subsection (3) shall include the provision that such commodity may be resold without reference to such contract in the following cases:

"(a) In closing out in good faith the owner's stock or any part thereof for the purpose of discontinuing delivering any such commodity.

"(b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(5) Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract referred to in subsection (3), whether or not the person so advertising, offering for sale or selling is a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The propositions claimed by defendants to establish the validity of the act are made upon two alternative assumptions : (a) That sec. 100.15 (2), Stats., is construed broadly to forbid issuance of stamps in every case where the manufacturer by any means whatever has established or fixed a minimum resale price; (b) that the section is construed to prohibit issuance of such stamps in relation to articles which are the subject of fair-trade contracts. On the first assumption the contentions are, (1) that the issuance of trading stamps is a proper subject for regulation in the exercise of the police power; (2) that sec. 100.15 (2) is a reasonable and proper exercise of this power; (3) that it is not so vague, indefinite, and uncertain as to be arbitrary and unreasonable; (4) that the issuance of trading stamps is not interstate commerce or so vitally connected therewith as to make the chapter an infringement of the commerce clause; (5) that sec. 100.15 (2), is not discriminatory or violative of the equal-protection clause for the reason that it does not embody an unreasonable and therefore unconstitutional classification; (6) that it must be construed to operate prospectively and hence not to impair the obligations of any contract. These contentions are made without reference to the previously enacted Fair Trade Act (sec. 133.25, Stats.).

Assuming that the court rejects these contentions, defendants claim that, considered in connection with the Fair Trade Act, sec. 100.15 (2), Stats., even though unconstitutional and invalid considered independently, must be held valid as complementary to existing fair-trade legislation. It is contended in connection with this that the issuance of trading stamps

which upon redemption would bring the total outlay below the stipulated resale retail price is a method of evading the policy of the Wisconsin Fair Trade Act, and that sec. 100.15 (2) forms a part of a general scheme of fostering the policies sought to be crystallized in the Fair Trade Act.

It is next contended that if the court, giving the act its broad construction, declines to sustain its validity either independently or in connection with the Fair Trade Act, it is bound to construe sec. 100.15 (2), Stats., so narrowly as to uphold it if that is possible. · Construed narrowly to apply only to commodities within the purview of the Fair Trade Act, it is asserted that sec. 100.15 (2), is a valid enactment to prevent evasions of that act.

At the outset, it is considered to be important and convenient to construe sec. 100.15 (2), Stats., and to determine whether, on the one hand, the act was designed to prohibit the issuance of trading stamps on articles upon which the manufacturer had fixed a retail minimum price regardless of the form which this restriction took, or whether, on the other hand, it is simply complementary to the Fair Trade Act and designed to prohibit the issuance of stamps solely in connection with the sale at retail of articles which are the subject of fair-trade contracts. This will avoid the necessity of canvassing and determining hypothetically a large number of constitutional questions. We are persuaded that the proper construction of the act is the narrower construction; that the chapter was designed to complement and reinforce the policy of the Fair Trade Act; and that when considered against the background of this type of legislation and its legislative history, its language must be so construed as to accomplish that end. The Fair Trade Act prohibits contracts in restraint of trade or commerce. As an exception, it authorizes contracts in connection with the sale of commodities bearing trade-mark brands offered in fair and open competition which require the retailer to resell at a price stipulated by the vendor.

This contract is required to contain exceptions permitting the retailer in closing out his stock or in dealing with damaged or deteriorated goods to sell at less than the agreed price. Sub. (5) of the Fair Trade Act makes violation of such a fair-trade contract unfair competition, actionable at the suit of any person damaged thereby. Thus, although the portion of the Fair Trade Act which authorizes contracts fixing a minimum retail price is in terms merely an exception to a general prohibition against agreements in restraint of trade, the act as a whole makes it plain that these contracts have won the affirmative and positive approval of the legislature in that they may not only be entered with impunity but their violation redressed as an act of unfair competition. The Fair Trade Act has been held constitutional and has been enforced by this court at the instance of persons injured by violation of it. *Weco Products Co. v. Reed Drug Co.* 225 Wis. 474, 274 N. W. 426. Hence, it must be concluded that it is the legislative policy to encourage and to protect contracts whereby the manufacturer of goods bearing a trade-marked brand or the name of the producer fixes a minimum retail price. Following closely in point of time the enactment of sec. 133.25, the legislature enacted sec. 100.15 (2), prohibiting the issuance of trading stamps in connection with the resale of goods with knowledge or notice that the resale price thereof had been fixed or established by the producer or distributor thereof when the price obtained on the resale, less the total redemption value of the stamps, "is below the fixed or established minimum price." It is obvious to us that, following as it does upon the heels of the enactment of the Fair Trade Act, this chapter was designed to fortify the earlier act and to prevent what the legislature considered to be a form of price cutting, which by reason of the indirectness of its method constituted an effective means of defeating or evading fair-trade contracts. It is not lightly to be assumed that, having carefully prescribed the type of contract by which minimum retail prices

could be established without disturbing antimonopolistic policies, the legislature meant in sec. 100.15 (2) to protect not merely such a contract but any unauthorized device by which a manufacturer might reach the same end. It appears to us that the natural and normal conclusion is that the legislature in adopting sec. 100.15 (2) had the more limited purpose of protecting the type of fair-trade contract that it sought to authorize and encourage, and that "fixed or established minimum price" refers and is limited to the only situation which could validly produce such a price.

We do not consider it necessary to use as a make-weight in reaching this conclusion the presumptions of validity in which courts are required to indulge, or to apply the doctrine that where an act is subject to two constructions, one of which will render it valid and the other invalid, a construction must be adopted which will give validity to the act. If it were necessary, the application of these doctrines would doubtless compel us to accept the narrower construction, even though it might not be as obvious as the broader construction. We shall not go into these matters because without the application of any of these rules of construction the legislative purpose and intent is sufficiently clear.

Having reached the foregoing conclusions with reference to the construction of the statute, the question presented is whether a statute is constitutional which prohibits the use of trading stamps redeemable in cash in connection with the resale of goods bearing trade-mark brand or mark of the producer or owner and concerning which there have been valid fair-trade contracts fixing a minimum resale price if the rebate involved in the stamp redemption brings the retail price of the goods below that stipulated in the fair-trade contract.

Before dealing with the specific objections to this act, it may be well to consider the extent of the police power of the state to deal with the subject of trading stamps. That it has the power to deal with the subject and to regulate and even pro-

hibit the issuance of trading stamps as a business device seems to us to be well established by this court in the *Trading Stamp Cases,* 166 Wis. 613, 166 N. W. 54, and by the United States supreme court in *Rast v. Van Deman & Lewis,* 240 U. S. 342, 36 Sup. Ct. 370, 60 L. Ed. 679, and *Tanner v. Little,* 240 U. S. 369, 36 Sup. Ct. 379, 60 L. Ed. 691. We do not deem it necessary to review in detail the reasons for this rule or to further justify the rule. The cases cited fully discuss the matter, especially the federal supreme court cases which were extensively discussed by this court in the *Trading Stamp Cases, supra.*

Several contentions are made that merit brief mention. It is suggested that the foregoing cases deal with stamps redeemable in merchandise and not in cash, and that their doctrines must be considered applicable only to such situations; and that since the Wisconsin act requires redemption in cash, all of the evils which the police power may validly reach are eliminated from the business of stamp merchandising, and the whole subject is out of the field of legislative regulation, or at least of legislative prohibition. We think this is not true. The Washington statute involved in the *Tanner Case, supra,* required that all stamps must be redeemed in cash if demanded by the purchaser. It was held that this difference did not affect the principle of the *Rast Case, supra,* which held valid a statute imposing special license taxes on merchants using trading stamps or coupons. Reliance is also had upon the fact that in the *Trading Stamp Cases, supra,* a distinction was taken between dealers who issued stamps redeemable in cash and those who redeemed in merchandise only. The court there said (p. 626) :

"It is manifest that there is a clear and well-defined distinction between such practices and that of issuing a 'slip, ticket, or check' which bears upon its face a stated cash value 're-deemable only in cash.'  .  .  .

"When the purchaser and seller understand that the token, coupon, or stamp issued with the sale of goods is of a stated cash value, redeemable in cash and only by the person issuing it, the transaction thereby becomes purged of the objectionable features and influences which such legislation condemns, and it follows naturally and logically that the legislative function has been properly exerted by enactment of the exception above quoted to remedy the evil incident to the unrestricted use of the trading stamps."

This statement was in answer to the contention that the classification which prohibited redemption of stamps in merchandise and authorized issuance of stamps redeemable in cash was an arbitrary classification and that the legislation was therefore discriminatory and void. The court did not say, and we think it could not say, that the whole subject of trading stamps was not within the scope of the police power. It did not categorically determine that the issuance of trading stamps redeemable in cash was completely void of all possible evils, but rather that there were marked differences in the extent of the evils and that the legislature might reasonably make a distinction between the two. It is evident from the federal supreme court cases and from the *Trading Stamp Cases* that the whole subject of trading stamps is a matter for legislative regulation within the police power; that while many of the evils which the legislature might suppose followed from the use of trading stamps might be thought peculiar to those redeemable in merchandise, others listed by the *Rast Case* might be thought equally to attend the issuance of stamps redeemable in cash; and that the legislature may regulate and even prohibit entirely the use of these devices. If the police power may be so exercised generally, it may with greater reason be used to fortify the policy of a validly enacted fair-trade law. In this connection the following quotation from the case of *Nebbia v. New York,* 291 U. S. 502, 529, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, is interesting

as indicating the scope ascribed by the federal supreme court to the *Rast Case:*

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers [citing *Rast v. Van Deman & Lewis,* 240 U. S. 342, 36 Sup. Ct. 370, 60 L. Ed. 679], and by other forms of price discrimination."

We conclude that the act is not invalid because of want of power in the legislature to deal with the subject.

The statute having been construed and the general scope of the police power with respect to the subject matter of this controversy having been set out, we approach the detailed constitutional objections to the act as so construed.

The first objection to the act is that it is fatally discriminatory in that it selects for prohibition one form or manner of granting a cash discount. It is contended in this connection that the granting of a cash discount does not effect a reduction in price but is a reward for a prompt payment of accounts, thus reducing credit losses and expenses incident to the extension of credit and enabling capital which would otherwise be tied up in accounts receivable to be employed productively in the business. This contention really amounts to the claim that the act is a nullity because there is nothing on which it can operate; that the only type of trading stamp prohibited is one that effects a reduction of the resale price; and that trading stamps do not have this effect and therefore the legislature has not succeeded in prohibiting anything. The trial court met this contention by limiting the operation of the act to trading stamps granting more than a two per cent reduction in price upon the theory that two per cent represented a fair cash discount, and that a cash discount does not reduce the selling price but is simply a reward for prompt payment of accounts. The contention that trading stamps are merely a

species of cash discount has substance and perhaps is true. It does not follow, however, that so considered the issuance of stamps does not effect a reduction of the stipulated resale price, and the fact is that it does result in such a reduction. This is obvious in all cash transactions and only slightly less so than in those involving credit. Hence, we conclude that the trial court erred in holding that to the extent of a two per cent discount trading stamps do not operate to reducè the resale price and are not within the prohibition of the subsection. The statute contains a simple and unambiguous test. Trading stamps are not to be issued in connection with the resale of the goods described in the act "when the price obtained on the resale less the total redemption value . . . is below the fixed or established minimum price."

The next question is whether sec. 100.15 (2), Stats., is fatally discriminatory in failing to include within its prohibition all cash discounts. We conclude that this question must receive a negative answer. In the first place, "if the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed." *Central Lumber Co. v. South Dakota,* 226 U. S. 157, 160, 33 Sup. Ct. 66, 57 L. Ed. 164, 42 L. R. A. (N. S.) 804. In the second place, plaintiffs' attempt to classify merchants into stamp and nonstamp merchants and to predicate a charge of discrimination upon this classification is fallacious. They are all simply merchants and the prohibition and permission apply alike to all. None may use stamps in relation to prohibited articles and all may use the cash discounts. There is no discrimination in this. Finally, we cannot say that the legislature might not reasonably have thought that trading stamps constituted a more effective device than

ordinary discounts for defeating fair-trade contracts. The stamp merchant by doubling or trebling the number of stamps issued on special days or under certain conditions or by increasing the redemption value of the stamps may successfully make large reductions in the resale price of goods which are more difficult to discover than the existence and scope of cash discounts. The legislature may also have considered that cash discounts were not in fact an evil of any consequence either because prohibited generally in fair-trade contracts or because not in general use by merchants. There is some evidence of a practice of prohibiting such discounts in fair-trade contracts. Various explanations may be given for the apparent failure to include in such contracts a prohibition against issuance of trading stamps. One is that in view of the statutory permission to use trading stamps having a cash redemption value the parties may have entertained doubts whether these could be outlawed by a fair-trade contract. This would in itself be a sufficient ground for legislative action, but at all events the legislature may reasonably have concluded that there were no existing evils of any consequence with respect to cash discounts because they were not in general use in connection with fair-trade contracts, while the issuance of stamps was sufficiently prevalent to call for regulation.

In connection with this general claim that sec. 100.15 (2), Stats., is discriminatory, it is suggested that stores frequently give free parking with the sale of a certain amount of merchandise and also free delivery service, fancy wrapping paper, and other advantages indistinguishable from stamps. This contention is dealt with and rejected in *Weco Products Co. v. Mid-City Cut Rate Drug Stores,* 3 C. C. H. Trade Regulation Service, 477, where the court said:

"Parking privileges, delivery service, and other services which defendant asserts are given by other stores, are provided for customers whether the articles purchased are under the protection of the Fair Trade Act or not, and are provided

regardless of and without reference to the amount of merchandise purchased. If one customer purchases merchandise of the value of $5 and another of the value of $500, each is accorded parking privileges and such other courtesies as are provided generally to the customers of the store. Trading stamps have a direct relationship to the price of the merchandise purchased. These stamps are not a store courtesy, but because of their fixed value in relation to the amount purchased constitute a discount on the purchase price of two mills on each ten cent purchase, or two cents on each purchase to the amount of $1, and double these amounts on the so-called double stamp days."

In addition to this, much of what has been said concerning cash discounts is applicable here.

With the construction of the act here adopted, several objections that are most applicable to a broader construction largely disappear. The objection that the law is fatally vague and uncertain cannot be successfully urged to the act as construed. What constitutes a fair-trade contract is clearly and definitely described in sec. 133.25, Stats. The limitations upon such contracts, the type of goods involved, the stipulations that must be in the contract to permit occasional cutting below the minimum price, are unambiguous. The stamp merchant, we apprehend, would have no difficulty in recognizing a valid fair-trade contract if it came to his attention. In addition to this, for the prohibition to apply, he must know or have notice that the particular article is the subject of a fair-trade contract. Knowledge and notice are terms that the law has dealt with for years and offer no uncertainties sufficient to invalidate the legislation. It is true that when put upon notice the stamp merchant has the burden of finding out what the contract is and whether it conforms to the Fair Trade Act, but this is not of such an onerous character as to invalidate the legislation. *Welch v. State,* 145 Wis. 86, 129 N. W. 656.

The argument that the act broadens the scope of price fixing in the state under the antitrust acts and extends the scope of

the Fair Trade Act obviously depends upon a broad construction of the act, which we reject. The argument that sec. 133.25, Stats., constitutes an unlawful delegation of legislative power to private individuals was dealt with and rejected by *Weco Products Co. v. Reed Drug Co., supra.*

The final contention relates to the penalty prescribed. Sec. 100.26 (3), Stats., provides a penalty for each offense under sec. 100.15 (2), of not less than $25 nor more than $5,000, or by imprisonment in the county jail for not more than one year or by both such fine and imprisonment. It is contended that this is discriminatory in that it singles out for a very severe penalty the issuance of trading stamps irrespective of intention, but in no way penalizes equally serious abuses. It is pointed out that the Fair Trade Act merely affords civil remedies no matter how flagrantly prices may be cut, and that ch. 56, Laws of 1939, which prohibits the sale of merchandise at less than cost, provides for fines in the amount of $10 to $50 for first conviction, and $50 to $500 for each subsequent conviction. This is claimed to be unconstitutional under the rule of *Stierle v. Rohmeyer,* 218 Wis. 149, 260 N. W. 647, which holds that the infliction upon one person for a particular type of violation a different penalty from that imposed on another for the same violation is a denial of the equal protection of the laws. Considered without reference to the absence of penalties for equally serious violations of the Fair Trade Act, the penalties cannot be considered so drastic, severe, and burdensome as to invalidate the act or that portion of it which prescribes them. The penalties are indeterminate in character, and discretion was left to a trial court to measure the penalty to the quality of the offense. See *Foster v. United States* (7th Cir.), 47 Fed. (2d) 892. It is obvious that, if the maximum fine were small, many large merchants might not be deterred from continuing the practices condemned by the statute. There is nothing to indicate that the penalties are within the class condemned by *Ex parte Young,* 209 U. S. 123, 28

Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Am. Cas. 764, upon the ground that their effect is to make a good-faith resistance to an alleged violation of law unduly hazardous. The objection that the penalties are discriminatory is met by the same reasoning that permits different legislative treatment of trading stamps and straight cash discounts. It may well have been considered that the trading-stamp practices were the most effective means of rendering fair-trade contracts ineffective, that they constituted the only present evil of any prevalence, and that the interest of any person entitled to bring a civil action would not be great enough to insure enforcement of the act. The selection of trading stamps for regulation or partial prohibition is a sufficient justification for prescribing a criminal penalty. In *Tigner v. Texas,* 310 U. S. 141, 147, 60 Sup. Ct. 879, 84 L. Ed. 1124, the United States supreme court made the following comment which appears to us to dispose of plaintiffs' contention:

"Appellant urges that the divergence between civil and criminal laws relating to the same conduct undermines the validity of the exemption in the criminal statute and thus invalidates the whole of it. This argument is but a minor variation on appellant's main theme. It amounts to a claim that differences substantial enough to permit substantive differentiation in formulating legislative policy do not permit differentiation as to remedy.

"How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by *qui tam* action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choice. . . .

"Legislation concerning economic combinations presents peculiar difficulties in the fashioning of remedies. The sensitiveness of the economic mechanism, the risks of introducing new evils in trying to stamp out old, familiar ones, the difficulties of proof within the conventional modes of procedure, the

effect of shifting tides of public opinion—these and many other subtle factors must influence legislative choice. Moreover, the whole problem of deterrence is related to still wider considerations affecting the temper of the community in which law operates. The traditions of a society, the habits of obedience to law, the effectiveness of the law-enforcing agencies, are all peculiarly matters of time and place. They are thus matters within legislative competence. To say that the legislature of Texas must give to farmers complete immunity or none at all, is to say that judgment on these vexing issues precludes the view that, while the dangers from combinations of farmers and stockmen are so tenuous that civil remedies suffice to secure deterrence, they are substantial enough not to warrant entire disregard. We hold otherwise. Here, again, we must be mindful not of abstract equivalents of conduct, but of conduct in the context of actuality. Differences that permit substantive differentiations also permit differentiations of remedy. We find no constitutional bar against excluding farmers and stockmen from the criminal statute against combination and monopoly, and so holding, we conclude that there was likewise no bar against making the exemption partial rather than complete."

Since the preparation of the foregoing opinion plaintiffs have directed the attention of the court to the decision of the supreme judicial court of Massachusetts in the case of *Sperry & Hutchinson Co. v. McBride, Director of the Division of the Necessaries of Life of the Commonwealth* (Mass.), 30 N. E. (2d) 269, which is claimed to sustain their contentions upon this appeal. A careful consideration of this decision has not changed our views as expressed in this opinion. With respect to the extent of the police power of the state to deal with the issuance of trading stamps the Massachusetts court does not follow the rule of the United States supreme court as announced in the *Rast Case, supra.* Since, as we have indicated, this court follows the federal rule, there is at the outset a fundamental difference in doctrine which cannot be bridged and which makes important contributions to conflicting solutions of other questions involved in the two cases. Further than

this, the Massachusetts case turned upon the fact that prohibiting the issuance of trading stamps had no reasonable relation to the object of the statute under examination, which was to prevent fraudulent and misleading business practices. No such contention is made here, and, if made, certainly could not be sustained. That sec. 100.15 (2), Stats., is well calculated to carry out the purposes of the Fair Trade Act is beyond debate.

*By the Court.*—Judgments reversed, and causes remanded with directions to enter judgments dismissing plaintiffs' complaints.

FOWLER, J. (*dissenting*). The act involved, instead of being general in its application, which seems to be the common understanding of it held by retailers, applies only to the very limited class of merchandise the price of which is governed by contract between the manufacturer and the retailers who on purchasing an article have agreed that they will not sell it for less than the price fixed by the manufacturer. When the price has been so fixed the act directly involved prohibits retailers who have received notice that the price of the article has been so fixed from granting stamps redeemable in cash in connection with sale of the article when the amount received, less the redemption value of the stamps, is less than the price fixed by the manufacturer. In *Weco Products Co. v. Reed Drug Co.* 225 Wis. 474, 274 N. W. 426, this court, following *Old Dearborn Distributing Co. v. Seagram-Dist. Corp.* 299 U. S. 183, 57 Sup. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476, held a statute constitutional that provided that articles, the prices of which have been fixed as above stated, may not be sold at less than the price so fixed. The opinion of the court herein holds, and I think correctly, that the statute involved applies only to sales covered by that statute.

The effect of delivering such stamps as are here involved in connection with sales is merely to allow a discount upon sales made for cash or prompt payment. Merchants commonly al-

low such discounts for prompt payment of goods sold on account, and allowing such discounts is a legal practice. Utility rate commissions approve such practice, and no one would think of questioning its legality. Such allowances are commonly as great or greater than the redemption value of the stamps here involved. To permit the practice last stated and forbid the practice here involved is to exalt the mere mechanics of a thing over the reason for it. To permit merchants not using stamps redeemable in cash to allow discounts for prompt payments and to prohibit merchants issuing such stamps, as stated, from allowing them is in my opinion an illegal discrimination violative of the equality clause of the Fourteenth amendment.

It seems to me that the opinion of the court makes two assumptions that are erroneous. One is that the statute does not make a classification of merchants into those who issue the prohibited stamps and those who do not use them. Reading of *Rast v. Van Deman & Lewis,* 240 U. S. 342, 351, 36 Sup. Ct. 370, 60 L. Ed. 679, shows that the statutes there involved were considered as making such classification, but that it was considered not discriminatory because there was a reasonable basis for the classification, and if the stamps were redeemable in merchandise the public welfare was affected through the "seduction and evil" involved that might be considered as leading to improvident purchases. The other erroneous assumption is the statement of the opinion that the opinion of the United States supreme court in *Tanner v. Little,* 240 U. S. 369, 36 Sup. Ct. 379, 60 L. Ed. 691, held that the *Rast Case, supra,* covered the situation where coupons were issued redeemable in cash only. This is expressly disavowed by the opinion in the *Tanner Case.* It is there said, p. 381, "And we may say here, as we said in *Rast v. Van Deman & Lewis, that we are not concerned with consideration* of a business in which coupons, etc., are issued or used and not redeemed in merchandise."

The opinion of the court seems to take the position that prohibition of the issue of trading stamps redeemable in cash is justified as an exercise of the police power because the issue of stamps redeemable in goods may be prohibited under that power. This, in my opinion, is erroneous because prohibition of the use of stamps redeemable in cash is not within the reason of the prohibition of the use of stamps redeemable in goods. This is pointed out in the *Trading Stamp Cases,* 166 Wis. 613, 166 N. W. 54. True, the issuance of stamps redeemable in cash was not within the issues of that case; but the issuance of stamps redeemable in goods was within those issues, and as the reasons given for upholding the prohibition of the class of stamps there involved do not apply to the issuance of those here involved that case is not authority for prohibition of "the issuance of trading stamps as a business device" as the opinion of the court herein says it is. Nor do either of the two other cases cited constitute such authority. The cases, so far as they involve trading stamps, involve those "redeemable in premiums." The basis of the ruling that the statute in the *Rast Case, supra,* made a legal classification of stores using trading stamps and those not using them was that while the use of stamps "redeemable in premiums" or prizes "may not be called in an exact sense a 'lottery,' may not be called 'gaming,' it may, however, be considered as having the seduction and evil of such." Opinion, p. 365. The case of *Tanner v. Little, supra,* also involved stamps redeemable in goods although it gave the purchaser the option to redeem the stamps in cash. The option, however, left in the act involved the "seduction and evil" feature likened in the quotation above to "gaming" and a "lottery."

The police power covers prohibitions of trade practices that may be considered as detrimental to public health, public safety, public morals, and that nebulous and indefinite thing—public welfare. Obviously neither of the first two are here involved.

The third is not involved unless we can say, as said in the *Rast Case* of stamps redeemable in goods, that using stamps redeemable in cash has "the seduction and evil" of a "lottery" and "gaming" and thus affects public morals. To me it seems obvious that it cannot be so said. As to public welfare, I am unable to perceive that any possible element or effect upon public welfare is involved. The objection to the use of the trading stamps here involved is apparently not by or in the interest of the public, but solely in the supposed interest of merchants who do not use or wish to use trading stamps redeemable in cash as a means of inducing sales for cash or prompt payment, who are objecting under the false impression that the statute is of general instead of the very limited application first herein pointed out.

As supporting the proposition that the instant act is within the police power, the opinion also relies on cases holding that the trade practice of selling a commodity for less or paying more for it in one community than others for the purpose of destroying a competing business in that commodity may be prohibited under that power, citing *Central Lumber Co. v. South Dakota,* 226 U. S. 157, 33 Sup. Ct. 66, 57 L. Ed. 164, 42 L. R. A. (N. S.) 804. Like cases are *State ex rel. Young v. Standard Oil Co.* 111 Minn. 85, 126 N. W. 527; *State v. Drayton,* 82 Neb. 254, 117 N. W. 768, 23 L. R. A. (N. S.) 1287; *State v. Bridgeman & Russell Co.* 117 Minn. 186, 134 N. W. 496; and *State v. Fairmount Creamery Co.* 153 Iowa, 702, 133 N. W. 895, 42 L. R. A. (N. S.) 821. These are "stifling competition" cases, and neither in their facts nor their reasoning do they bring the instant case within the police power.

The opinion quotes a statement from *Nebbia v. New York,* 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, as citing the *Rast Case, supra,* in support of the price fixing by legislative enactment involved in the *Nebbia Case.*

The *Rast Case* is not authority to the point suggested. It did not involve price fixing by legislative enactment. But if the statute here involved be considered as price fixing from the standpoint of legislative enactment it is unconstitutional because the merchandise involved under the statute is not affected with a public interest. *New State Ice Co. v. Liebmann,* 285 U. S. 262, 52 Sup. Ct. 371, 76 L. Ed. 747; *Old Dearborn Distributing Co. v. Seagram-Dist. Corp., supra.* The last word upon the rule that prices cannot constitutionally be fixed by legislative enactment is the case last above cited, which was decided later than the *Nebbia Case.* It is there said, p. 192, that—

"The right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth amendments. *Tyson & Brother v. Banton,* 273 U. S. 418, 429; *Wolff Co. v. Industrial Court,* 262 U. S. 522, 537; *Ribnik v. McBride,* 277 U. S. 350; *Williams v. Standard Oil Co.* 278 U. S. 235; *New State Ice Co. v. Liebmann,* 285 U. S. 262. These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them."

Every case of the United States supreme court upholding legislative price fixing, as distinguished from retail prices fixed by the manufacturer, involved commodities clearly affected with a public interest or involved the fixing of wages at not below a standard declared as necessary for protection of the health or morals of the workers.

It is further to be noted that the discounts here involved are so trivial in amount as not to bring this case within the purpose of the statute involved in the *Weco Case.* A discount of two per cent on sales for cash or prompt payments of accounts by retailers is not a matter of concern to a manufacturer who

has sold his article to retailers who have agreed not to sell his article at less than the price fixed by him. So small a discount cannot affect the manufacturer's "good will" in his articles, or injuriously affect the reputation of that article, or destroy or diminish the manufacturer's sales of it at his regular wholesale price. The sole purpose of the statute involved in the *Weco Case* was, as said in *Old Dearborn Co. v. Seagram Corp., supra,* p. 198, "to afford a legitimate remedy for an injury to the good will which results from the use of trade-marks, brands or names." It is in these things that the statute involved in the *Weco Case* aimed to protect the manufacturer and his contracts. Classification, to be valid under the equality clause of the Fourteenth amendment, must bear some reasonable relation toward accomplishing the purpose of the statute that prescribes the classification. The classification here involved, which by necessary implication puts merchants who use trading stamps redeemable in cash in one class, and those not using them but doing the same thing without using them that the merchants using them do by using them in another class, has no relation to accomplishing the purpose of the statute involved in the *Weco Case.*

The opinion quotes from a case decided by a superior court of California, a trial court of no greater, if as great, weight as authority as the court from which the judgment here involved is appealed. So far as the quotation recites that granting parking privileges and the like are legitimate trade practices I agree with it. But I do not agree that a two per cent discount has any considerable "direct relationship to the price of the merchandise purchased." The selling price of the merchandise remains as the manufacturer fixes it. The discount is trivial and utterly inconsequential to the manufacturer. Why hang the constitutionality of the instant statute upon a mere trifle— and upon a thing that is entirely outside the purpose of the statute the instant statute is aimed to support, and has no effect whatever toward effecting that purpose.

For the reasons above stated I think the statute involved should be declared unconstitutional, and the decision of the trial court upheld.

A motion for a rehearing was denied, with $25 costs, in the Schuster case, and with no costs in the Herzfeld-Phillipson case, on March 11, 1941.