

# THE ATTORNEY GENERAL

# OF TEXAS

AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

May 3, 1965

Honorable R. H. Cory, Chairman        Opinion No. C-429
State Affairs Committee
House of Representatives               Re: Constitutionality of
Austin, Texas                              House Bill 583.

Dear Representative Cory:

        You have requested an opinion from this office con-
cerning the constitutionality of House Bill 583 of the 59th
Legislature.

        Section 3 of House Bill 583 provides in part that
from and after the effective date of the Act no person shall:

        "(a)  Offer, use, make use of, or attempt
    to offer, use or make use of, any gift enterprise
    of any nature whatsoever, directly or indirectly
    in or with any retail sale of gasoline, oil, or
    other petroleum product for use in any motor
    vehicle.

        "(b) Use, issue, furnish or distribute, in,
    with, or for the retail sale of any gasoline, oil,
    or other petroleum products for use in any motor
    vehicle any tickets, coupons, certificates, cards,
    stamps, or other similar devices, as a part of or
    in connection with any gift enterprise as herein
    defined."

        Section 2(b) of House Bill 583 provides that "gift
enterprise" shall mean:

        ". . .the selling of anything with a promise,
    either express or implied, to give anything in
    consideration of such sale or any plan, scheme,
    device or arrangement whereby the seller either
    expressly or impliedly promises to give the buyer
    anything in consideration of such sale and shall

-2020-

include but not be limited to the issuing, supplying, distributing, or furnishing, in, with, or for the sale of goods, wares, or merchandise any tickets, coupons, certificates, cards, stamps, or other similar devices, which shall entitle the purchaser receiving the same with the sale of such goods, wares or merchandise to procure from any person, firm, association, or corporation, any goods, wares, or merchandise upon the production of any number of such tickets, coupons, certificates, cards, stamps, or other similar devices."

Section 1(a) and Section 7, the emergency clause of the Act, of House Bill 583, state that the Act is enacted pursuant to the provisions of Section 47 of Article III of the Constitution of Texas. Section 47 of Article III of the Constitution of Texas provides that:

"The Legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other states." (Emphasis added).

In passing upon the constitutionality of House Bill 583, the initial consideration must deal with the question of whether the acts prohibited by House Bill 583 are the type of acts which the provisions of Section 47 of Article III of the Constitution of Texas directs the Legislature to enact laws to prohibit.

House Bill 583, in effect, prohibits and makes it a misdemeanor, punishable by a fine or imprisonment or both, for anyone to use, issue or distribute any tickets, coupons, certificates, cards, stamps, or other similar devices in connection with the retail sale of gasoline, oil or other petroleum products for use in any motor vehicle under an arrangement which would entitle the purchaser of the gasoline, oil or other petroleum product to procure goods, wares or merchandise in exchange for such tickets, coupons, certificates, cards, stamps or other similar devices.

For the foregoing prohibited acts to fall within the scope of the mandate found in Section 47 of Article III of the Constitution of Texas, such acts must in actuality, and not merely in name, be a lottery, gift enterprise or other evasion involving the lottery principle.

The provisions of Section 47 of Article III of the Constitution of Texas were discussed at great length by the Supreme

Court of Texas in the case of City of Wink v. Griffith Amusements Co., 129 Tex. 40, 100 S.W.2d 695 (1936), in which the court stated:

". . .It is hardly necessary to argue that the 'Bank Night' plan of the defendant in error if not a lottery, is at the very least a 'gift enterprise involving the lottery principle', and obviously an evasion of the lottery laws of the state. That 'gift enterprises' are a form of lottery evasion is so well known that courts take judicial knowledge of the plan. . . ."

". . .

". . .If it be granted that the plan of defendant in error's 'Bank Night' was not a lottery because a charge was not made for the registration entitling one to participate in the drawing (and this is the only distinction which is here or could be made), then it clearly comes within the condemnatory terms of the Constitution, because it is a 'gift enterprise' involving the lottery principle, which the authorities hold is that principle by which something is to be given by chance. . . .

"In general, it may be said that chance is the basic element of a lottery. Unless a scheme for the awarding of a prize requires that it be awarded by a chance, it is not a lottery. . . .

"There are, however, in a lottery, according to the authorities, three necessary elements, namely, the offering of a prize, the award of the prize by chance, and the giving of a consideration for an opportunity to win the prize. . . But the Constitution condemns those things which fall short of containing all of the essential elements of a lottery, namely, those things which involve the lottery principle, of which 'chance' is the one which constitutes the very basis of a lottery, and without which it would not be a lottery." (Emphasis added).

The decision of the Supreme Court of Texas in City of Wink v. Griffith Amusement Co., supra., makes it abundantly clear that the course of conduct condemned by Section 47 of Article III of the Constitution of Texas must be either a lottery or involve the lottery principle, and to fall within this category any so-called lottery, gift enterprise or other evasion involving the lottery principle must have present the essential element of a lottery-- namely, the element of chance. The prize or thing to be awarded must be determined by chance. These principles laid down by our Supreme Court in City of Wink v. Griffith Amusement Co., supra.,

that a lottery or gift enterprise involves the element of chance, finds support in numerous decisions from other jurisdictions. See, D'Orio v. Jacobs, 275 P. 563 (Wash.Sup. 1929); D'Orio v. Startup Candy Co., 266 P. 1037 (Utah Sup. 1928); Russell v. Equitable Loan & Security Co., 58 S.E. 881 (Georgia Sup. 1907); State v. Fox-Great Falls Theater Corp., 132 P.2d 689 (Montana Sup. 1942); United Jewelers Mfg. Co. v. Keckley, 90 P. 781 (Kan. Sup. 1907); Bills v. People, 157 P.2d 139 (Colorado Sup. 1947); City of Oxford v. Ritz Theater, 180 So. 88 (Ala. 1938); Barker v. State, 193 S.E. 605 (Georgia Ct.App. 1937).

While the provisions of House Bill 583 state that it is enacted pursuant to the provisions of Section 47 of Article III of the Constitution of Texas, and defines the prohibited acts as a gift enterprise, we are of the opinion that when the prohibited acts are tested by the principles set forth in City of Wink v. Griffith Amusement Co., supra., that an essential element is lacking, and in the absence of such element the acts prohibited in House Bill 583 cannot be regarded as the lottery, gift enterprise or other evasion involving the lottery principle to which Section 47 of Article III of the Constitution of Texas is directed.

The essential element which is absent from the acts prohibited in House Bill 583 is the element of chance. In the instant case the prize or thing to be awarded is not determined by chance. The purchaser of gasoline, oil or other petroleum products at retail, for use in his motor vehicle and who is given tickets, coupons, certificates, cards, stamps or other similar devices, is not dependent upon the element of chance in the procuring of his award or prize in the form of goods, wares or merchandise--he merely surrenders a specified number of tickets, coupons, certificates, cards, stamps or other similar devices in exchange for certain specified goods, wares or merchandise.

Consequently, in view of the decision in City of Wink v. Griffith Amusement Co., supra., and the principles set forth therein, we are of the opinion that the acts prohibited by House Bill 583 are not the type of acts which the provisions of Section 47 of Article III of the Constitution of Texas directs the Legislature to enact laws to prohibit.

As we are of the opinion that Section 47 of Article III of the Constitution of Texas is neither a mandate to, nor authorization for, the Legislature to prohibit the course of conduct set forth in House Bill 583, it then becomes necessary, in passing upon the constitutionality of House Bill 583, to ascertain if the provisions of the Act, which clearly regulate, if not in fact prohibit, certain businesses and occupations, as well as restricting the use of private property and the freedom of contract, are a valid exercise of the police power of the State. If the provisions of

House Bill 583 are within the police power of the State, the Act is constitutional. However, should the provisions of House Bill 583 exceed the police power of the State, the enactment then contravenes the due process clause of the Constitution of Texas, Section 19 of Article I, and is unconstitutional.

It is clear that in order for House Bill 583 to be a proper exercise of the police power of the State it must be reasonably necessary to the protection or improvement of the public health, safety, morals, good order, comfort and general welfare. 12 Tex.Jur.2d 415, Constitutional Law, Sections 70-111. As was stated by the court in Ex Parte Smythe, 116 Tex. Crim. 146, 28 S.W.2d 161 (1930), and in Neel v. Texas Liquor Control Board, 259 S.W.2d 412 (Tex.Civ.App. 1953, error ref., n.r.e.), the bill must:

> ". . .have some reasonable relation to the subjects included in such power, and the law must tend, in a degree that is perceptible and clear toward the prevention of some offense or manifest evil, or the furtherance of some object within the scope of the police power. . . . 6 R.C.L. Constitutional Law, Paragraph 227." (Emphasis added).

It was said of the police power of the State in Houston & T.C. Ry. Co. v. Dallas, 98 Tex. 396, 84 S.W. 648 (1905), at page 653 and quoted with approval in Neel v. Texas Liquor Control Board, supra., Coleman v. Rhone, 222 S.W.2d 646 (Civ.App. 1949, error ref.) and Ex Parte Smythe, supra.:

> "It is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort, and convenience as consistently as may be with private property rights. . .But as the citizen cannot be deprived of his property without due process of law, and as a prevention by force of the police power fulfills this requirement only when the power is exercised for the purpose of accomplishing, and in a manner appropriate to the accomplishment of, the purpose for which it exists, it may often become necessary for courts . . .to inquire as to the existence of facts upon which a given exercise of the power rests and into the manner of its exercise, and if there be an invasion of property rights under the guise of this power, without justifying occasion, or in an unreasonable, arbitrary or oppressive way, to give the injured parties the protection which the Constitution secures."

Large discretion necessarily is vested in the Legislature to determine not only the requirements of the public interest, but also by what measures those interests may be properly and effectively secured. If there is room for a fair difference of opinion as to the necessity and reasonableness of an enactment on a subject lying within the domain of the police power the courts will not interfere. 12 Tex.Jur.2d 422, Constitutional Law, Sec. 76. But, as was pointed out by the courts in the foregoing decisions, the judgment of the Legislature does not conclude inquiry by the courts as to the existence of the facts essential to support the exercise of the police power.

Section 1 of House Bill 583 provides in part that:

"The Legislature finds as facts and determines that:

". . .

"(b) The sale of gasoline, oil and other petroleum products at retail for use in motor vehicles is a substantial and integral part of the economic life of the State, providing a means of livelihood for in excess of 40,000 Texas gasoline service station operators and their families as well as providing employment for thousands of other Texas citizens employed by such petroleum retailers.

"(c) The State of Texas and the Texas public have a vital interest in the maintenance of a sound and healthy economy in the retailing of gasoline and other petroleum products, not only because of such retailers' contributions to the State's total economy and the care and maintenance of motor vehicles traveling on Texas highways, but also, because such retailers each year collect for the State of Texas hundreds of millions of dollars on taxes on gasoline and other petroleum products in which taxes such retail operators are being forced to furnish and distribute stamps, coupons and other such tickets or devices as a part of various kinds of gift enterprises established in the retail sale of gasoline, oil and other petroleum products.

"(d) The gasoline retail market in Texas is in a state of chaos and despair with thousands of service station operators being forced out of business each year due to long prevailing, bare subsistence margins of retail operations over

which such retail operators have no control and from which they are helpless to extricate themselves since, unlike the free and competitive market prevailing in the sale and distribution of ordinary products and commodities, service station dealers and operators are, in practically all instances, not free to bargain as to the prices for which they purchase gasoline and other petroleum products from their supplier and unable to freely and independently determine the sales price of their products.

"(e)  Gift enterprises and the giving, distributing, and the furnishing of tickets, coupons, certificates, cards, stamps and other similar devices with retail sales of gasoline, oil and other petroleum products are substantial contributing factors to the prevailing chaotic retail market conditions in Texas and the losses and business failures of thousands of small independent service station operators each year."

The only decision by the courts of this State concerning the prohibition of acts similar to those found in House Bill 583, namely the giving of trading stamps in connection with the purchase of a product, is the case of Texas Liquor Control Board v. Super Savings Stamp Company, 303 S.W.2d 536 (Tex.Civ.App. 1957). While the court in this case stated that it was within the authority of the Texas Liquor Control Board to promulgate a rule or regulation prohibiting the giving of trading stamps in connection with the sale at retail of alcoholic beverages, we are of the opinion that this decision affords little, if any, assistance in connection with the issue of whether the giving of trading stamps in connection with the retail sale of gasoline, oil and other petroleum products is within the police power of the State.  The sale of alcoholic beverages is by its very nature in an area in which the State may exercise its police power for the protection of the public health, safety, morals, good order, comfort and general welfare.  However, the exercise of the police power of the State in this specific area dealing with the sale of alcoholic beverages would not necessarily justify its exercise in the area of the retail sales of gasoline, oil and other petroleum products which do not have connected with their sale the possible detriment to the public interest or welfare.

While there have been no court decisions in Texas dealing specifically with the constitutionality of a statute containing provisions similar to those contained in House Bill 583, there have been an abundance of court decisions in other jurisdictions upon similar statutes.

While there is a definite split of authority on this question, the great majority of the State court opinions hold that statutes prohibiting and regulating the use of trading stamps are unconstitutional as not being within the sphere of the police power under State constitutions. Garden Spot Market, Inc. v. Byrne, 378 P.2d 220 (Mont.Sup. 1963); Logan's Supermarkets v. Atkins, 202 Tenn. 448, 304 S.W.2d 628 (1957); State v. White, 199 Tenn. 544, 288 S.W.2d 428 (1956); Sperry & Hutchinson Co. v. Hoegh, 246 Iowa 9, 65 N.W.2d 410 (1954); Sperry & Hutchinson Co. v. Margetts, 15 N.J. 203, 104 A.2d 310 (1954); Jolovitz v. Redington & Co., 148 Me. 23, 88 A.2d 598 (1952); Sperry & Hutchinson Co. v. Hudson, 190 Ore. 458, 226 P.2d 50 (1951); Alabama Independent Service Station Ass'n v. Hunter, 249 Ala. 403, 31 So.2d 571 (1957); Alabama Independent Service Station Ass'n. v. McDowell, 242 Ala. 424, 6 So.2d 502 (1942); Food and Grocery Bureau of Southern California v. Garfield, 20 Cal.2d 228, 125 P.2d 3 (1942); Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N.E.2d 269 (1940); People v. Victor, 287 Mich. 506, 283 N.W. 666 (1939); Sperry & Hutchinson Co. v. Dent, 287 Mich. 55, 283 N.W. 685 (1939); State v. Lathrops-Farnham Co., 84 N.H. 322, 150 Atl. 551 (1930); Lawton v. Stewart Dry Goods Co. and Ware v. Sperry & Hutchinson Co., 197 Ky. 384, 247 S.W. 14 (1923); State v. Holtgreve, 58 Utah 563, 200 Pac. 894 (1921); Denver v. United Cigar Stores Co., 68 Colo. 363, 189 Pac. 848 (1920); In re opinions of the Justices, 226 Mass. 613, 115 N.E. 978 (1917); State v. Sperry & Hutchinson Co., 110 Minn. 387, 126 N.W. 129 (1920); United Cigar Stores v. Stewart, 144 Ga. 724, 87 S.E. 1034 (1916); State v. Sperry & Hutchinson Co., 94 Neb. 785, 144 N.W. 795 (1913); State v. Caspare, 115 Md. 7, 80 Atl. 607 (1911); State v. Sperry & Hutchinson Co., 110 Minn. 378, 126 N.W. 130 (1910); Denver v. Frueaff, 39 Colo. 30, 88 Pac. 389 (1906); Ex Parte Drexel, 147 Cal. 763, 82 Pac. 429 (1905); People v. Zimmerman, 102 App.Div. 103, 92 N.Y.Supp. 497 (1905); State v. Ramseyer, 73 N.H. 31, 51 Atl. 958 (1904); Winston v. Hudson, 135 N.C. 386, 47 S.E. 1023 (1904); Young v. Commissioner, 101 Va. 197, 56 Atl. 983 (1903); People ex rel. Madden v. Dyker, 72 App.Div. 208, 76 N.Y. Supp. 111 (1902); State v. Dalton, 22 R.I. 77, 46 Atl. 234 (1900); Ex Parte McKenna, 122 Cal. 429, 58 Pac. 916 (1899); 26 A.L.R. 707, Constitutionality of Trading Stamp Legislation; 134 A.L.R. Constitutionality of Statute Prohibiting Giving of Premiums or Trading Stamps with Purchase of Commodities; 133 A.L.R. 1087, Constitutionality of Statute Prohibiting Giving of Premiums or Trading Stamps.

In fact, there appears to be only two decisions in the United States since 1919--Steffey v. City of Casper, 357 P.2d 456 (Wyo. 1961) and Cushenberry v. Shanahan, 190 Kan. 378, 378 P.2d 66 (1963), which have held this type of legislation to be constitutional.

The minority view that legislation prohibiting or severely curtailing the use of trading stamps is a valid exercise

of the state's police power is reflected in the following cases: Steffey v. Casper, 357 P.2d 456 (1961); State v. J. M. Seney Co., 135 Md. 437, 107 Atl. 19 (1919); State ex rel. Sperry & Hutchinson Co. v. Weigle, 166 Wis. 613, 166 N.W. 54 (1918); Sperry & Hutchinson Co. v. State, 188 Ind. 173, 122 N.E. 584, (1919); State v. Pitney, 79 Wash. 608, 140 Pac. 918 (1914); State v. Underwood, 139 La. 288, 71 So. 513 (1916); State v. Crosby Bros. Mercantile Co., 103 Kan. 733, 176 Pac. 321, Id. 1918, 103 Kan. 896, 176 Pac., 679 (1918); Pitney v. State of Washington, 240 U.S. 387; Tanner v. Little, 240 U.S. 369 (1916); Rast v. Van Denman & Lewis Co., 240 U.S. 342 (1916); District of Columbia v. Kraft, 35 App.D.C. 253, certiorari denied 218 U.S. 673 (1910); Lansburgh v. the District of Columbia, 11 App.D.C. 512 (1897).

In Ed. Schuster & Co. v. Steffes, 237 Wis. 41, 295 N.W. 737 (1941), a statute which, in effect, prohibited the use of trading stamps to avoid the state's fair trade act was sustained. That case may be regarded as being on different footing from that of a statute which, in effect, abolishes the use of trading stamps.

Trading stamps have been said by the courts taking the minority view to: "appeal to cupidity and lure to improvidence," (the Rast case); produce "provoked and systemized reckless buying," (the Tanner case); "encourage indiscriminate and unnecessary purchasing" and "force other merchants into using stamps or suffer loss of trade by failure to do so" (the Pitney case). They have been called the tools of a business which "is a mere parasite," (the Underwood case). They have further been said to produce "pernicious and evil effects," (the Weigle case); and to take a "large sum of money. . .from the merchant and his customers," and "add to the gross cost of living of all the people of the District," (the Kraft case).

However, a most forceful rebuttal to the minority view's arguments is found in the case of Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S.W. 14, 16 (1923), where the court stated:

"In the first place it is said that the trading stamp or premium system encourages profligate and wasteful buying and operates as a lure to improvidence. As a matter of fact, it is simply a convenient method of allowing a discount for cash. Therefore, it encourages cash buying and operates as an incentive to prudence and economy. But let us assume that it is a lure to improvidence. Have we reached the point where the prohibition of every business that leads to improvidence may be regarded as a proper governmental function? Nothing is more alluring to the purchaser

than an attractive advertisement or a beautiful shop window, but can it be said that the merchant who employs such means to increase his profits may be put out of business because, perchance, some one may see the advertisement or look in the window and be induced to buy when he cannot afford to do so?  If so, how far may the doctrine be carried?  Why not prohibit all forms of advertising and the sale of all articles of luxury on the ground that they lead to extravagance?  Why not require every merchant to restrict his stock to overalls or cotton dresses so as to reduce the 'lure' to a minimum?

"Another objection is that the trading stamp introduces into business a middleman who receives a profit, not only from the stamps sold, but from those that are not redeemed, and thereby adds to the cost of the article.  If the middleman may be dispensed with, what is to become of all agents, factors, brokers, and commission merchants?  Indeed, why not go all the way and prohibit not only all retail merchants, but all wholesale merchants and jobbers and compel everybody to buy directly from the manufacturer?

"Another alleged evil is that the trading stamp or premium gives opportunity for fraud in values and prices.  It is true that one may use the trading stamp or premium dishonestly, just as he may be dishonest in other respects, but we fail to see wherein the use of trading stamps or premium affords any greater opportunity for fraud than already exists.  Indeed, all businesses afford an opportunity for fraud in values and prices, but a business that may be dishonestly conducted should not be prohibited because of the dishonesty of some who are engaged in the business.

"Another contention is that the trading stamp gives opportunity for coercion, in that merchants are compelled to buy in order to compete with their rivals.  Doubtless the trading stamp company may ask one merchant to buy its stamps on the ground that his competitors have bought or intend to buy, but that is not a form of coercion of which the law will take notice. The same method of making sales is followed by all business houses, particularly the wholesalers who desire to introduce some novelty or a new

Hon. R. H. Cory, page 11 (C- 429)

line of goods, and, if the legislature undertook
to prohibit every business whose agents indulged
in the practice of arousing a spirit of rivalry
among their customers, the channels of trade would
soon be closed."

The court stated in Sperry & Hutchinson Co. v. McBride,
supra., that:

"Trading stamps have been in use long
enough so that any purchaser of merchandise
who is interested in acquiring and converting
them to his advantage cannot be said to be
likely to be deceived as to their value.

". . .there is no reasonable cause to believe
that the dealer who offers them in consideration
of cash or approved credit sales will resort to
fraudulent practices."

In People v. Victor, 287 Mich. 506, 283 N.W. 606 (1939),
the Court held unconstitutional a statute which prohibited certain
classes of merchants from giving premiums, such as trading stamps
to promote sales. The court said:

"By giving a premium, the defendant was
merely offering the purchasing public more for
its money. Surely there is nothing reprehensible
in that. It is apparent that the giving of a
premium has no evil effects which the Legislature
has sought to correct. . .There is no reasonable
relation between the prohibition of the giving of
a premium and the protection of the public health,
morals, safety and welfare."

Attorney General's Opinion No. WW-1047 (1961) dealt
with the constitutionality of House Bill 438, Acts of the 57th
Legislature, Regular Session (1961). House Bill 438, which was
not enacted into law, contained essentially the same type of
provisions found in the present House Bill 583. While House Bill
438 was much broader in scope and not limited merely to the re-
tail sale of gasoline, oil and other petroleum products for use
in motor vehicles as is House Bill 583, each of these bills are
essentially the same in operation as they would prohibit the
giving of trading stamps or other similar devices in connection
with retail sales.

Attorney General's Opinion No. WW-1047 (1961) held that
House Bill 438 was unconstitutional and stated therein that:

"Doubtedless, trading stamps may be a source of annoyance to some. The use of these stamps may be especially worrisome and, indeed, even costly to many merchants who feel obliged to use them in order to meet the competition from other stores that do so. But does this reasonably necessitate the assertion of the police power? In our opinion, it clearly does not. In Spann v. Dallas, supra., it was observed in page 516:

'It is with common humanity--the average of the people that police laws must deal. A lawful and ordinary use of property is not to be prohibited because repugnant to a particular class.'

"Moreover, would it not be just as reasonable to outlaw advertising or credit or 'free parking' at stores and 'free delivery service' or 'free gift wrapping' or any one or more of the countless other trade inducements which are customarily utilized by merchants in a competitive business economy. These 'extras' surely add to the cost of doing business just as do trading stamps. They also oblige the other merchants to do likewise in order to hold their trade. Indeed, some merchants may not be able to meet the competition. But is that not what free enterprise is: the right of every citizen to use his property as he chooses, and as best he can, without interference from the government, so long as the rights of others are not infringed upon? And, there is no right to be free from fair competition, that 'right' and our American right to compete honestly being mutually exclusive."

". . .

"It follows from the foregoing that, in our judgment, not only the weight of authority, but the better reasoning, preponderates in favor of the view that House Bill 438 bears no reasonable relation to any legitimate object within the scope of the police power, and, therefore, the bill contravenes the due process clause, Section 19, Article I, of the Constitution of Texas."

We are of the opinion that the result reached in Attorney General's Opinion No. WW-1047 (1961), concerning the

Hon. R. H. Cory, page 13 (C-429)


constitutionality of House Bill 438, and the principles upon which results were based are equally applicable to House Bill 583.

While the statement of factual findings in Section 1, Subsections (b) through (e), of House Bill 583 attempts to overcome one of the objections raised in Attorney General's Opinion WW-1047 (1961) to the effect that:

"Significantly, House Bill 438 is silent as to the ultimate evil at which it is directed. It fails to cite any reason why it could be to the public interest to prohibit and restrict the use of trading stamps in the manner provided in the bill. We can perceive no danger to the public welfare in the use of trading stamps which would warrant the complete prohibition of their use by retailers, wholesalers, stamp companies, consumers and others who might use such stamps. We are left to conclude that the reason for the enactment falls among those which have been discredited by the majority of the courts of the country."

We are of the opinion such attempt is nevertheless insufficient to cure the unconstitutionality of House Bill 583 for two reasons.

First, the ultimate evil sought to be eliminated by the prohibitions in House Bill 583, as stated by the factual findings in Section 1 thereof is the chaos and economic difficulties being encountered by those persons engaged in retail sale of gasoline, oil and petroleum products for use in motor vehicles who give trading stamps in connection with the sale of their product. This chaos and economic difficulty referred to in House Bill 583 does not affect the public generally, but is limited to only that segment of business involved in the retail sale of petroleum products for use in motor vehicles. As stated in 16 C.J.S. 944, Constitutional Law, § 195:

". . ./T/he legislature cannot use the police power as a subterfuge to do something that it otherwise could not do in the infringement of private interests or the restraint of private rights. The police power must be exercised for public purposes only; the legislature may not exercise the police power for private purposes, or for the exclusive benefit of particular individuals or classes. . . ."

Such being the case, House Bill 583 appears to be merely an effort to ease the economic plight of a segment of the business world

rather than a valid exercise of the police power of the State in the interest of the health, safety, morals, good order, comfort and welfare of the public in general.

Secondly, the great weight of authority, and the trend of court decisions since 1919 in that only two courts since 1919 have held similar acts to be constitutional, while at least fifteen states have held legislation banning the use of trading stamps to be unconstitutional, leads us to the conclusion that statutes prohibiting and regulating the use of trading stamps, such as House Bill 583, are not within the valid exercise of the police power of a State and are therefore unconstitutional.

In view of the foregoing, we are of the opinion that House Bill 583 is unconstitutional by reason of being beyond the scope of the police power of the State and in contravention of Section 19 of Article I of the Constitution of Texas, which provides:

"Sec. 19. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

We are not passing upon whether the findings of fact which appear in paragraphs (c), (d) and (e) of Section 3 of House Bill 583 violate our antitrust statutes.

## S U M M A R Y

House Bill 583, 59th Legislature, Regular Session (1965) is unconstitutional by reason of being beyond the scope of the police power of the State and therefore in contravention of Section 19 of Article I of the Constitution of Texas.

Very truly yours,

WAGGONER CARR
Attorney General

By: Pat Bailey
Pat Bailey
Assistant

PB:mkh

Hon. R. H. Cory, page 15 (C- 429)


APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
Roy Johnson
Sam Kelley
W. O. Shultz
John Banks

APPROVED FOR THE ATTORNEY GENERAL
BY:   Stanton Stone