MADISON METROPOLITAN SEWERAGE DISTRICT and others, Appellants, vs. COMMITTEE ON WATER POLLUTION and another, Respondents.

*November 8—December 4, 1951.*

232

*William Ryan* of Madison, for the appellants Madison Metropolitan Sewerage District and H. O. Lord.

*Harold E. Hanson,* city attorney, for the appellant city of Madison.

For the respondents there was a brief by the *Attorney General, Warren H. Resh,* assistant attorney general, and *Norris E. Maloney,* special counsel, and by *Richard W. Bardwell,* district attorney of Dane county, and *Joseph Goodman,* assistant district attorney, and oral argument by *Mr. Maloney, Mr. Resh,* and *Mr. Goodman.*

MARTIN, J. This case involves an abundance of scientific and technical detail, and the well-written briefs of counsel have been of great help to the court.

No claim is made that the findings of fact are not supported by the evidence, and we, therefore, set out only so much of the evidence as will give the necessary background. The innumerable complaints received by the Governor's Committee in its investigation of pollution of the Madison lakes can leave no doubt that nuisance conditions exist on Lakes Waubesa and Kegonsa. The record is full of testimony regarding such conditions.

Appellant contends, however, that the findings do not support the order since it is not specifically stated therein that the effluent from appellant's plant creates a nuisance and that there are no findings of fact that would justify a conclusion that the discharge of such effluent creates a nuisance.

Sec. 144.05 (1), Stats., as amended by ch. 435, Laws of 1949, provides:

"When any city or village or owner shall have constructed or shall in the future construct a sewage system complying with section 144.04, the outflow or effluent from such system may be discharged into any stream or drain constructed pursuant to law, but no such outflow of untreated sewage or effluent from a primary or secondary treatment plant

from a city or metropolitan sewage district comprised of forty-five thousand persons or more, shall be discharged directly into, or through any stream, or through any drain, into a lake of more than two ·square miles and less than six square miles in area located within ten miles of the system or plant of such city, or metropolitan sewage district. All necessary construction of plant, system, or drains for full compliance with this subsection in the discharge of untreated sewage or sewage effluent from all existing primary or secondary plants shall be completed by June 1, 1951, and the plans for any new system or plant shall include provisions for compliance with this subsection. The state committee on water pollution shall have the power and authority at any time to order and require any owner of an existing plant to prepare and file with it, within a prescribed time, preliminary or final plans or both, for proposed construction to comply with this subsection. In lieu of the construction in compliance with the foregoing provision for diversion from such lakes, any owner of an existing plant, on or before June 1, 1950, or any owner of a new system or plant prior to construction of such new system or plant, may file with the committee on water pollution such plans for advanced treatment of effluent from primary or secondary treatment as in the judgment of said committee will accomplish substantially the same results in eliminating nuisance conditions on such lake as would be accomplished by diversion of secondary sewage effluent from said lake (without at the same time creating other objectionable or damaging results), and such owner shall be exempt from the foregoing provisions of this subsection for diversion from such lakes upon approval of such plans and installation of advanced-treatment facilities and procedures in compliance therewith, provided that nothing shall impair the authority of said committee to require at any time preliminary or final plans, or both, for diversion construction. . . ."

In enacting ch. 435, Laws of 1949, the legislature said that under circumstances such as exist here with regard to population, size of lakes, and distance from sewage-treatment plants, sewage effluent may not be discharged into a lake;

that compliance with such law is to be had by June 1, 1951, unless by June 1, 1950, some plan of treatment be submitted which will accomplish the same results "in eliminating nuisance conditions" as would be accomplished by diversion. Here is a situation where the legislature has found the nuisance conditions to exist. See *State ex rel. Abbott v. House of Vision, etc.* (1951), 259 Wis. 87, 47 N. W.. (2d) 321.

.When the appellant, a metropolitan sewage district comprised of more than forty-five thousand persons, discharges its sewage effluent into the waters of Lake Waubesa, 3.181 square miles in area and located within ten miles of the Nine Springs plant, it violates the provisions of sec. 144.05 (1), Stats., in creating or increasing the nuisance conditions which the statute by its terms seeks to prevent or cure. Since the legislature has found that a nuisance exists under these circumstances, a specific finding to that effect by the committee is unnecessary. It is likewise unnecessary that the committee specifically find damage to health, property,. or other nuisance conditions.

Even if the legislature itself did not find that nuisance conditions exist under such circumstances, findings number 2 and 6 of the order of June 26, 1950:

"2. That sewage tributary to said treatment plants receives treatment in modern accepted facilities to produce an effluent satisfactory from the standpoint of biochemical oxygen demand and bacterial content but that said effluent contains substantial amounts of inorganic phosphorus and inorganic nitrogen."

"6. That inorganic phosphorus and inorganic nitrogen in the quantities discharged by the Madison Metropolitan Sewerage District into the waters of Lake Waubesa contribute substantially to the growth of blue-green algae of the type that creates *objectionable conditions* in Lakes Waubesa and Kegonsa."

substantially express the finding that nuisance conditions exist, or will exist, as the result of appellant's present operations.

It is argued that finding 7:

"That removal or diversion of said sewage effluent from the waters of the above-named lakes will diminish objectionable conditions by reducing the frequency and intensity of algal blooms,"

does not state the extent to which the objectionable conditions will be diminished by removal or diversion of effluent. It is not necessary for the findings to state the exact extent to which they will be reduced, since by finding 6 a *substantial* contribution to the growth of the algae which creates the objectionable conditions was found to be made by the inorganic phosphorus and inorganic nitrogen in the effluent discharged by appellant's plant.

The argument is based upon testimony by Dr. Sawyer, a member of the Governor's Committee, that a significant decrease in nuisance conditions on Lake Waubesa would not result from the removal of eighty-five or ninety per cent of the phosphorous from the sewage effluent. This statement must be taken in connection with all the testimony offered by Dr. Sawyer. It is to be noted that in summing up the results of the survey made by the Governor's Committee, Dr. Sawyer said:

"I think that that is one of the important points that our survey demonstrated, that when the phosphorus concentration would be reduced to levels below about a hundredth of a part per million, the biological action would be slowed down and arrested so as to prevent the development of nuisance blooms."

Dr. Sawyer further testified that Lake Waubesa and Lake Kegonsa contained excess phosphorus at all times, while in

the other fifteen lakes studied in connection with the survey, without exception, "the phosphorus content dipped to about a hundredth of a part per million." It was his opinion that in a lake with plenty of phosphorus "you have there the makings for the biological bloom or an algal bloom of the blue-green variety which are capable of fixing nitrogen."

The Committee on Water Pollution has the authority and duty to enforce sec. 144.05 (1), Stats. The statute specifically grants that authority. It does not have to find that a nuisance actually exists for under the authority granted it by sec. 144.53 (1) it shall "exercise general supervision over the administration and enforcement of all laws relating to the pollution of the surface waters of the state."

Sub. (5) of said sec. 144.53, Stats., further provides that it shall have authority:

"To issue special orders directing particular owners to secure such operating results toward the *control of pollution of the surface waters* as the committee may prescribe, within a specified time. . . . If such results are not secured in the specified time, the committee may direct the owner to take certain steps, or to use or adopt designated systems, devices, and methods for handling industrial wastes, refuse, and other wastes within a specified time. Any such orders may be modified by subsequent orders. The committee shall have the same power and authority as has been conferred upon the state board of health by section 144.04 with reference to ordering and approving plans. . . ."

Sec. 144.536, Stats., provides that all orders of the committee shall be enforced by the attorney general; that the circuit court for Dane county shall have jurisdiction to enforce such orders by injunctional and other appropriate relief; and further provides:

"For purposes of such proceeding where the order prohibits in whole or in part any pollution, a violation thereof shall be deemed a public nuisance. . . ."

The decision of the trial court so well covers all the remaining questions that an effort to improve thereon would be futile. We therefore adopt said decision and make the same a part of this opinion:

Petitioner and intervenors take the position that ch. 435, Laws of 1949, violates various provisions of the United States and state constitutions. Respondent denies this and argues further that if perchance this be so, no creature of the legislature can raise a constitutional objection; and that the intervening taxpayer is likewise impotent inasmuch as both the city of Madison and the Madison Metropolitan Sewerage District are contesting in good faith the validity of the order of the Committee on Water Pollution. The position of the respondent, in the court's opinion, is sound.

*As to the United States constitution.* As to alleged violation of the federal constitution little need be said.

"A municipal corporation . . . has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor* (1933), 289 U. S. 36, 40, 53 Sup. Ct. 431, 77 L. Ed. 1015.

The authority of the legislature over a municipal corporation is supreme, subject, however, to such limitations as may be prescribed by the state constitution. *Shirk v. Lancaster* (1933), 313 Pa. St. 158, 169 Atl. 557; *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 300 N. W. 187.

*As to the state constitution.* As early as 1872 the Wisconsin supreme court in *State ex rel. Voight v. Hoeflinger,* 31 Wis. 257, 263, referring to municipalities, stated:

"No principle of law is better settled than that 'whatever is given by statute may be taken away by statute,' except vested rights acquired under it, and except also that the statute must not be in the nature of a contract on the part of the legislature. Some of the authorities go even farther, and hold that a law merely divesting antecedent vested rights of property, where there is no contract, is not inconsistent

with the constitution." See *Bell v. Bayfield County* (1931), 206 Wis. 297, 239 N. W. 503.

The petitioner, of course, is a quasi-municipal corporation. See 37 Am. Jur., Municipal Corporations, p. 625, sec. 6.

The case of *State ex rel. Zilisch v. Auer* (1928), 197 Wis. 284, 293, 221 N. W. 860, 223 N. W. 123, involved the constitutionality of an act of the legislature providing for the detachment of land from certain school districts under given circumstances and providing for its attachment to another district or the creation of a new district. In discussing the status of municipal corporations, so far as legislation is concerned, the court said, by quoting with approval from other cases:

" 'Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. . . . The state, therefore, at its pleasure, may . . . expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the constitution of the United States. Although the inhabitants and property owners may, by such changes, suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the federal constitution which protects them from these injurious consequences. The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it.' " See *Hunter v. Pittsburgh* (1907), 207 U. S. 161, 28 Sup. Ct. 40, 52 L. Ed. 151; *School Dist. v. Callahan* (1941), 237 Wis. 560, 297 N. W. 407; *Williams v. Mayor, supra.*

As heretofore stated, the city of Madison and all other municipal units whose sewage is treated by the Madison Metropolitan Sewerage District are creatures of the legislature, as is the Madison Metropolitan Sewerage District itself. It is a quasi-public or quasi-municipal corporation.

Certain districts are often created with limited powers for the carrying out of some particular public purpose. They are quasi-public corporations or quasi-municipal corporations and are governed by the rules applicable to municipal corporations. 37 Am. Jur., Municipal Corporations, p. 625, sec. 6, and cases cited.

The distinction between the rights of an individual citizen and the rights of a creature of the legislature under the constitution must always be kept in mind. Most of the authorities cited by petitioner, as to rights under the constitution being violated, are cases dealing with the rights of individuals, and not creatures of the legislature, who are permitted by the legislature to perform certain acts for a certain time and under certain conditions. As stated above, these rights having been given by the legislature may be modified or taken away by the legislature, with the exception noted as to vested rights and contractual rights between the legislature and the complaining creature of the legislature. Metropolitan sewerage districts had no right to exist prior to 1927 (see ch. 442, Laws of 1927, now secs. 66.20 to 66.209, Stats.), and hence, without any doubt, are creatures of the legislature. The legislature might in its wisdom destroy such districts and if it can destroy them, it may certainly regulate them.

Likewise, the city of Madison is a municipal corporation, a creature of the legislature and an arm of the state.

In 56 Am. Jur., Waters, p. 813, sec. 388, the rule is stated as follows:

"The state may in the exercise of its police power require that sewage be purified before being cast into a stream, or

it may absolutely prohibit the use of streams for such purpose. It has been stated that the right of a municipality to empty its sewage into a stream or a river is merely a legislative license revocable whenever public health and safety require. No constitutional property right is invaded by absolutely prohibiting the casting of any obnoxious matter into any running stream of the state."

". . . the decisions in a great majority of the states regard the incorporated city or town as a sole creature of the state, possessing and exercising state powers only, and hence, unless special organic provision forbids, the power of the legislature over such local organ is unlimited." 1 McQuillin, Municipal Corporations (2d ed.), p. 746, sec. 268.

"In accordance with the settled doctrine that municipal corporations of all kinds, including incorporated cities . . . are regarded as creatures . . . of the state government, the legislature unless restrained by the constitution, in conferring powers and imposing obligations on municipal corporations, may within its discretion designate limitations thereon." 2 McQuillin, Municipal Corporations (3d ed.), p. 12, sec. 4.04. See *In re Application of Racine* (1928), 196 Wis. 604, 220 N. W. 398, 221 N. W. 109.

". . . a municipal corporation 'is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government—essentially a revocable agency—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state—and therefore fully subject to the control of the legislature, who may enlarge or diminish . . . its functions, may change or modify its internal arrangement, or destroy its very existence with the mere breath of arbitrary discretion . . . for the power which can create and destroy can modify and change.' " 2 McQuillin, Municipal Corporations (3d ed.), pp. 15–18, sec. 4.05.

In the rather late case of *State ex rel. Martin v. Juneau, supra,* there was a contest involving the contention by the city of Juneau that a joint order of the State Board of Health and Committee on Water Pollution directing the city to

take immediate steps for the preparation of plans for a complete sewage-treatment plant and to install the same by a certain date was in excess of the statutory powers of the agencies and not reasonably necessary as a health measure. The court said (p. 571):

"It is clear that the provisions of our constitution only slightly restrict the power of the legislature over municipal corporations and those restrictions apply only to local affairs. Municipalities obtain no vested right under an act of the legislature, the constitution reserving to the legislature the power to repeal or alter any such act."

*No contractual rights involved.* A municipal corporation being a governmental agency whose powers are derived from and subordinate to the state, a municipal charter or other legislation affecting a municipal corporation is not a contract within the contemplation of a constitutional prohibition against the impairment of the obligations of a contract and the legislature retains the power to amend or repeal such charter and to enlarge or curtail the powers granted thereby. *Cape Girardeau County Court v. Hill* (1886), 118 U. S. 68, 6 Sup. Ct. 951, 30 L. Ed. 73; 19 R. C. L., Municipal Corporations, p. 731, sec. 37; *Williamson v. New Jersey* (1889), 130 U. S. 189, 9 Sup. Ct. 453, 32 L. Ed. 915.

"The municipality itself, which is a mere creature of the legislature, is in no position to complain of the action of that body in reassuming powers previously delegated. The obligation of no existing contract is impaired by such an act and no vested rights are thereby disturbed." *Central Union Tel. Co. v. Indianapolis Tel. Co.* (1920), 189 Ind. 210, 230, 126 N. E. 628.

". . . the city being a municipal corporation and the creature of the state legislature, does not stand in a position to claim the benefit of the constitutional provision in question, since its charter can be amended, changed, or even abolished at the will of the legislature. . . .

". . . the municipality, being a mere agent of the state, stands in its governmental or public character in no contract relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked, without the impairment of any constitutional obligation, while with respect to its private or proprietary rights and interests it may be entitled to the constitutional protection." *New Orleans v. New Orleans Water Works Co.* (1891), 142 U. S. 79, 89, 91, 35 L. Ed. 943, 12 Sup. Ct. 142.

To the same effect are: *Worcester v. Worcester Consolidated Street R. Co.* (1905), 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591; *State v. Aberdeen* (1904), 34 Wash. 61, 74 Pac. 1022; *Sanger v. Bridgeport* (1938), 124 Conn. 183, 198 Atl. 746.

*No vested rights involved.* Municipalities, such as petitioner, derive all their rights and privileges from legislative act. They are, therefore, subject to legislative will and may have such rights or charter abolished by the legislature and are not to be regarded as thereby being deprived of any vested rights. *Joslin Mfg. Co. v. Providence* (1923), 262 U. S. 668, 43 Sup. Ct. 684, 67 L. Ed. 1167; *East Hartford v. Hartford Bridge Co.* (1850), 51 U. S. (10 How.) 511, 13 L. Ed. 518; *Covington v. Kentucky* (1899), 173 U. S. 231, 19 Sup. Ct. 383, 43 L. Ed. 679.

*Rights of H. O. Lord, intervening taxpayer.* A taxpayer's right of action is the same as that of the city of Madison and the Madison Metropolitan Sewerage District and can be asserted only if and when either municipality fails to act. The theory upon which a taxpayer's action is permitted is discussed in *Willard v. Comstock* (1883), 58 Wis. 565, 17 N. W. 401. It is there held that a taxpayer may appear in behalf of himself and others similarly situated after demand and refusal of the corporate authorities to bring suit in the premises. In *Estate of Cole* (1899), 102 Wis. 1, 7, 78 N. W. 402, it was held that where the officers of a public

corporation refuse to put the necessary judicial machinery in motion upon demand being made therefor and failure to so act, a taxpayer may bring suit on behalf of himself and others similarly situated. The court said:

"The direct injury to be remedied where the taxpayer intervenes and sets the judicial machinery in motion for that purpose, is not personal and direct to himself, but to the corporation. The question is, Are the members of the corporation as a whole aggrieved? If so, rather than that justice shall fail, the court will take jurisdiction of the subject of controversy at the instance of a taxpayer. The fact that the threatened injury or the wrong done is to the corporation, and that its governing body or officers, who should move in the matter, neglect or refuse to do so, creates a necessity for some other way to remedy the mischief, and in that situation the circumstance of a person being a taxpayer and interested in the protection of its rights is a sufficient test of his competency to challenge the threatened wrong, or wrong actually done, in a court of justice."

See also *State ex rel. Knapp v. Pohle* (1925), 185 Wis. 610, 202 N. W. 148, where the court, in speaking of a taxpayer's action, said that whatever his rights they certainly do not rise above those of the joint district.

See also *New Orleans v. New Orleans Water Works Co.,* *supra,* where the court said (p. 93):

"Little need be said with regard to the appeal of Conery and the other taxpayers; they sue in the right of the city, the rights of the city are their rights, and they have no other or greater rights upon this appeal than has the city. Indeed, the city has, in its amended and supplemental answer, joined with them in the assertion of its rights, and they are bound by the disposition of the case against it."

In 52 Am. Jur., Taxpayers' Actions, p. 7, sec. 10, it is said:

"If a taxpayer is permitted to maintain a taxpayer's suit, it is not in his individual right, but as the representative of

the district whose interests are alleged to be jeopardized by the inefficiency or maladministration of its officers, and he has no other or higher right than the district or municipality itself could claim if the action were prosecuted in its name, and hence he can maintain the action only in cases where the district or municipality itself could do so. The derivative nature of the action is brought out forcibly in the rationale of the theory by which taxpayers' suits are maintainable as being analogous to stockholders' suits, and by the usual requirement that antecedent demand be made upon the prosecuting official of the public body to enforce the claim of such public body." See also 52 Am. Jur., Taxpayers' Actions, p. 17, sec. 26; *Koshkonong Mud Creek D. Dist. v. Bodeman* (1928), 197 Wis. 261, 221 N. W. 864.

In the opinion of the court the taxpayer has no rights that are higher than those of either the Madison Metropolitan Sewerage District or the city of Madison and has no legally protectible interest which he is in a position to assert in this proceeding. In the case at bar the same counsel represents the Madison Metropolitan Sewerage District and the taxpayer, H. O. Lord, and with the city of Madison is vigorously contesting the order of the Committee on Water Pollution.

The legislature created and gave to the petitioner Madison Metropolitan Sewerage District and the city of Madison, intervenor, certain rights and privileges. It has the power to regulate them in the exercise of said rights and privileges, or if necessary take the rights and privileges entirely away, if in its wisdom it sees fit to do so. It is clear that there are no contractual relationships or vested rights involved.

It seems to us, therefore, under the law that none of those asking for a declaration by the court that the statute in question violates various provisions of the federal and state constitutions has any standing in court to assert them.

*Constitutional objections.* Notwithstanding this fact, let us examine some of the objections raised.

That serious nuisance conditions result in the vicinity of the Madison lakes is undisputed. It is likewise undisputed that the Madison Metropolitan Sewerage District, in a very large part, is responsible for these conditions. It is the opinion of the experts that diverting the effluent to moving waters will remedy the situation. This leaves only the question of expense involved. That is a matter for legislative consideration and not the courts.

"A grant of power to a municipality to discharge sewage from a sewer into tidewater does not authorize it to do so in such manner as to create a nuisance." 11 McQuillin, Municipal Corporations (3d ed.), p. 224, sec. 31.25.

It was held in *Squaw Island F. T. Co. v. Buffalo* (1937), 273 N. Y. 119, 7 N. E. (2d) 10, that the power of a municipal corporation to construct sewers or to use a natural stream as a sewer does not authorize it so to construct the sewer or to use the stream so as to create a nuisance to the damage of a lower riparian owner.

"The great weight of authority, American and English, supports the view that legislative authority to install a sewer system carries no implication of authority to create or maintain a nuisance, and that it matters not whether such nuisance results from negligence or from the plan adopted. If such nuisance be created, the same remedies may be invoked as if the perpetrator were an individual." *Winchell v. Waukesha* (1901), 110 Wis. 101, 109, 85 N. W. 668.

A city is liable for maintenance of a nuisance even when operating in its governmental capacity. *Harper v. Milwaukee* (1872), 30 Wis. 365; *Mitchell Realty Co. v. West Allis* (1924), 184 Wis. 352, 199 N. W. 390; *Hasslinger v. Hartland* (1940), 234 Wis. 201, 290 N. W. 647.

The objection that the act would deprive the petitioner of property without due process of law contrary to the Fourteenth amendment to the United States constitution is not

applicable, as this provision applies only to property held by a municipality in its proprietary capacity. *Bell v. Bayfield County* (1931), 206 Wis. 297, 239 N. W. 503. Here the property is held by the municipality in performance of a governmental duty. The right to do so is given by statute. The right may be regulated by the legislature and a public nuisance can always be abated.

*Classification valid.* Whether the distance of the lake from the plant of the system is a proper basis for classification presents a somewhat difficult question. It would seem that to pour the effluent into the lake eleven miles away would be no different than pouring it into one nine miles or any other distance away from the plant. It is not so much the distance of the lake from the plant that causes the damage but apparently the volume of the sewage and size and type of the lake. However this may be, the testimony establishes that carrying the effluent in moving waters for over ten miles will tend to destroy the potency of the nutrient. We are of the opinion that the distance feature does not render the act void for improper classification.

Regarding the population classification, apparently the legislature was of the opinion that sewage from cities of lesser population might be handled by static waters of a given volume and area without creating a nuisance, but that from cities of forty-five thousand or more population it could not. The legislature evidently found and, hence, concluded that in cities of forty-five thousand population or more, nuisance conditions might develop when the sewage effluent was poured into relatively static waters of a certain size such as the Madison lakes, namely, more than two square miles and less than six square miles in area located within ten miles of the plant so giving off the effluent.

"Whether the basis of classification adopted is wise and judicious, and whether it will operate as fairly as some other

basis that might be adopted, are questions for the legislature and not for the courts. The extreme limit of judicial inquiry in this direction is whether the basis adopted bears any reasonable relation to the subject to which the legislature has applied it, and whether it is germane to the law. Unless the classification adopted by the legislature is plainly illusory, or may be applied illusively, the judgment of the legislature must prevail." 37 Am. Jur., Municipal Corporations, p. 712, sec. 101.

In *State ex rel. Kellogg v. Currens* (1901), 111 Wis. 431, 435, 87 N. W. 561, it is said:

"The sufficiency of the reasons for a classification of persons in respect to privileges or restrictions is for the legislature, not for the courts; and only in a case clear beyond a reasonable doubt will the courts declare a statute invalid on the ground that its purpose or the classifications it makes are without reason to support them. [Syllabus.]

"These limitations, however, according to all the authorities, state and federal, are to be read as not extending so far as to deprive the states of their power to so control the conduct of individuals as to protect the welfare of the community,—a power commonly described as the 'police power.' . . . Hence courts have struggled well-nigh since the commencement of our government to define the line of demarkation between what is permitted and what is forbidden to the legislature by the constitutional restrictions above referred to, and it has been decided with substantial unanimity that upon those subjects wherein the welfare of the community at large is jeopardized by unrestrained freedom of will and action in every individual the legislature may impose restraints, and that such restraining laws are within the constitutional requirement of uniformity and equality between individuals if they affect all individuals who are situated and conditioned alike with reference to the subject under consideration; that, from the nature of things, class legislation, strictly speaking, must exist; that some classes of our citizens may safely enjoy greater privileges, and other classes may be placed under different burdens and restrictions, . . ."

The question of classification is primarily for the legislature, both as to need and basis. In *Servonitz v. State* (1907), 133 Wis. 231, 239, 113 N. W. 277, the court said:

"In considering the subject we must bear in mind that the policy of classification is a matter wholly within legislative discretion, and that whether there is room for the classification made in any given case is primarily a legislative question and can never become a judicial one except for the purpose of determining, in any given situation, whether legislative action passed the boundaries of reason, reasonable doubts to be resolved in the negative."

Another authority says:

"The circumstances of a particular locality, or the prevailing public sentiment in that section of the state, may require or make acceptable different police regulations from those demanded in another, . . . The legislature may therefore prescribe or authorize different laws of police, . . . in each distinct municipality, provided the state constitution does not forbid. These discriminations are made constantly; and the fact that the laws are of local or special operation only is not supposed to render them obnoxious in principle." 2 Cooley, Constitutional Limitations (8th ed.), p. 804.

It seems to the court that the statute meets constitutional requirements relating to classification. All that seems to be required is that there must be some reasonable basis along general lines for the adoption, all reasonable doubts to be resolved in favor thereof, and when this is found the judicial function ends and the legislative function begins. *Mehlos v. Milwaukee* (1914), 156 Wis. 591, 146 N. W. 882. The main requirement is that it must apply equally to all within the class. *Kiley v. Chicago, M. & St. P. R. Co.* (1909), 138 Wis. 215, 119 N. W. 309, 120 N. W. 756.

*Statute is presumed valid.* It is well established in Wisconsin, as in most states, that any repugnance between a legislative act and the provisions of the constitution must be

clear and irreconcilable, and that in matters involving only questions of public policy the determination of the legislature is final and conclusive on the courts. *State ex rel. Attorney General v. Cunningham* (1892), 81 Wis. 440, 51 N. W. 724; *State ex rel. Kellogg v. Currens, supra; Ritholz v. Johnson* (1944), 244 Wis. 494, 12 N. W. (2d) 738. In the case of *State ex rel. Kellogg v. Currens* the court held that only in a case clear beyond a reasonable doubt will the court assert that a law is without reason to support either its purpose or the classification it makes. In *State ex rel. Carnation M. P. Co. v. Emery* (1922), 178 Wis. 147, 160, 189 N. W. 564, the court said:

"If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court." See 11 Am. Jur., Constitutional Law, p. 776, sec. 128.

Unless the court can say that the law appears on its face to be unreasonable and unnecessary it must find that the facts before the legislature were sufficient to justify the requirement. If circumstances could exist to justify the requirements, it must be presumed that such circumstances did exist. *Cream City B. P. Co. v. Milwaukee* (1914), 158 Wis. 86, 147 N. W. 25; *State ex rel. Carnation M. P. Co. v. Emery, supra.* In the case at bar it appears without substantial dispute from the expert testimony that facts do exist justifying the regulation in question.

If there is any choice as to construction the court should adopt the construction which will sustain the statute. *Petition of Breidenbach* (1934), 214 Wis. 54, 252 N. W. 366; *Petition of State ex rel. Attorney General* (1936), 220 Wis. 25, 264 N. W. 633.

The question of policy and wisdom is not before the court. The wisdom or expediency of particular regulations under the police power is primarily for the legislature rather than the courts. *Janesville v. Heiser* (1933), 210 Wis. 526, 246 N. W. 701; 16 C. J. S., Constitutional Law, p. 567, sec. 198.

"With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." *Nebbia v. New York* (1934), 291 U. S. 502, 537, 78 L. Ed. 940, 54 Sup. Ct. 505.

The statute is not subject to attack because it does not cover the entire field.

It is claimed that other fertilization nutrients come from other sources and that the removal of the contribution from the Madison Metropolitan Sewerage District will not eliminate completely the nuisance conditions. This may be true, but it appears without substantial dispute that seventy-five per cent of the inorganic nitrogen content of Lake Waubesa and eighty-seven per cent of the total inorganic phosphorus content of said lake comes from the sewage-plant effluent of petitioner; that in turn Lake Kegonsa receives its greatest contribution of these nutrient elements from Lake Waubesa; that these two lakes are fertilized about seven and twelve times, respectively, as heavily as ordinary farm lands; in other words, that although the effluent from the Madison Metropolitan Sewerage District is satisfactory from the standpoint of biochemical demand and bacterial content it it a very heavy fertilizer for the plant life in the lake resulting in excessive algal bloom and the resulting decay thereof with

the nuisance conditions to the water and obnoxious odors resulting.

A statute does not violate the equal-protection clause merely because it is not all-embracing. *Zucht v. King* (1922), 260 U. S. 174, 43 Sup. Ct. 24, 67 L. Ed. 194.

"The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.'" *Patsone v. Pennsylvania* (1914), 232 U. S. 138, 144, 34 Sup. Ct. 281, 58 L. Ed. 539.

This question was passed upon in *Ed. Schuster & Co. v. Steffes* (1941), 237 Wis. 41, 55, 295 N. W. 737, where the court said:

"The next question is whether sec. 100.15 (2), Stats., is fatally discriminatory in failing to include within its prohibition all cash discounts. We conclude that this question must receive a negative answer. In the first place, 'if the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.' *Central Lumber Co. v. South Dakota*, 226 U. S. 157, 160, 33 Sup. Ct. 66, 57 L. Ed. 164, 42 L. R. A. (N. S.) 804."

This rule was approved in *Roschen v. Ward* (1929), 279 U. S. 337, 339, 49 Sup. Ct. 336, 73 L. Ed. 722:

"A statute is not invalid under the constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it tends to produce."

The main factual question in this case is, Do the property owners abutting on these lakes and citizens generally have to stand by and permit the nuisance to increase progressively

until their properties have become worthless, the waters of the lake unfit for fish or for domestic use of any kind when according to the testimony it could be very substantially improved by casting this effluent into a moving stream rather than semistatic waters?

It is established in this case that nuisance conditions develop when the sewage effluent from a community in excess of forty-five thousand population is discharged in relatively static bodies of water such as Lakes Waubesa and Kegonsa, —bodies of water more than two square miles and less than six square miles in area and located within ten miles of petitioner's plant. A careful examination of the record shows that conditions around the lakes when this rank growth of algae is decaying are simply unbearable. There seems to be no argument over this. Hence there was no occasion for the legislature to enact a measure more sweeping and far reaching than was necessary to correct an evil known to arise only under such limitations as to population and lake size. If the legislature had set up a standard upon an entirely unknown set of facts, the law might be open to attack on ground of unreasonableness. However, it was limited in its regulations only to known conditions.

Although others may contribute to these conditions in a lesser degree and no action has been commenced to eliminate their contribution, that fact is no excuse or justification for the Madison Metropolitan Sewerage District to continue to so interfere with the natural growth of the plant life in the lakes as to in part cause the obnoxious conditions and nuisance referred to. If others do not deter in their making contribution to this obnoxious condition, presumably proper action will be taken by the proper authorities with reference thereto.

The court has carefully considered all other constitutional objections urged and does not believe any of them apply.

It is our opinion that there are no constitutional objections to the statute in question and, further, that if there were, neither the petitioner nor intervenors may assert them. The judgment affirming the order of the Committee on Water Pollution is affirmed.

*By the Court.*—Judgment affirmed.