STEARNS and others, Appellants, vs. STATE OF WISCONSIN COMMITTEE ON WATER POLLUTION, Respondent: ROCK COUNTY, Intervenor and Appellant.*

*October 12—November 7, 1956.*

* Motion for rehearing denied, without costs, on January 7, 1957.

For the appellants there was a brief by *George H. Murwin* of Janesville, *Albert H. Gill* of Evansville, and *Theodore P. Bidwell* of Janesville, joined in by *Joseph B. Forrestal,* district attorney, for Rock county, and oral argument by *Mr. Gill, Mr. Murwin,* and *Mr. Forrestal.*

For the respondent there was a brief by the *Attorney General* and *Warren H. Resh,* assistant attorney general, and oral argument by *Mr. Resh.*

MARTIN, J.   On October 19, 1949, pursuant to the provisions of sec. 144.05 (1), Stats., the Wisconsin Committee on Water Pollution (hereinafter called the "committee") ordered the Madison Metropolitan Sewerage District (hereinafter called the "district") to submit plans for eliminating

the discharge of untreated sewage or treated sewage effluent into Lakes Monona, Waubesa, and Kegonsa. The judgment which affirmed said order on review was affirmed by this court in *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 50 N. W. (2d) 424, which upheld the validity of sec. 144.05 (1).

Pursuant to the order the district submitted to the committee plans for the diversion of effluent through the Badfish creek and Yahara river into Rock river. Appellants, filing a complaint under sec. 144.537, Stats., alleged that the adoption of such plan would create a nuisance and irreparable damage to them and that they had never been afforded a public hearing on approval of the plan. They asked the committee to accept jurisdiction of their complaint, to hold hearings thereon, and to disapprove of the diversion project. Thereafter, the district filed its answer stating that it had decided on July 13, 1953, to transmit its effluent from the disposal plant to Badfish creek and then through a ditch formed by deepening and widening Badfish creek and then by the existing channel of the Badfish to the Yahara; that preliminary plans had been filed with the state board of health and final plans would be filed when completed; that the district has not and is not discharging any effluent into Badfish creek.

It is argued that the answer did not comply with the requirements of sec. 144.537, Stats., and that the committee should have granted the relief demanded in the petition. Among other things, that section provides for hearing on "alleged water pollution" and uses the words "alleged polluter" in requiring an answer to the complaint. It was the position of the district that the term "alleged polluter" means one who is presently polluting and could not apply to the district since it was undisputed that the district is not discharging effluent into the waters referred to in the complaint. The committee adopted the view that in any event the appellants were entitled to an investigation and hearing under

sec. 144.53 (2) which gives it broad powers:

"To study and investigate all problems connected with the pollution of the surface waters of the state and its control and to make reports and recommendations thereon."

And treated the petition as sufficient to invoke its jurisdiction thereunder. We see no error in the procedure adopted by the committee.

While provisions similar to those of sec. 263.26, Stats., have been incorporated in rules adopted by some administrative agencies, the Committee on Water Pollution has never adopted such a rule. If it had applied such a rule and granted appellants relief by default, it would have committed reversible error in acting in excess of its statutory authority· or jurisdiction. Sec. 227.20 (1) (b).

Even if sec. 144.537, Stats., were held to apply and the district regarded as an "alleged polluter" within the meaning thereof, the answer of the district was sufficient. Issue was joined when it denied it was polluting; under the circumstances it was not required to do more. See 41 Am. Jur., Pleading, p. 431, sec. 198 *et seq.*

Appellants contend that they will be deprived of their constitutional rights under sec. 144.05 (2), Stats., if the proposed diversion plan is put into operation. The section provides:

"The city or village or the owner of land through which the drain is constructed may apply to the circuit court of the county in which the land is located to determine the damages, if any. No injunction against the use shall be granted until the damages are finally determined and payment refused. Unless within six months after the system is completed the owner of the land shall institute such proceedings he shall be barred. The proceedings shall be according to chapter 32 of the statutes, so far as applicable."

It was the opinion of the lower court that this section applies only to damages resulting from the acquisition of right of way; that it "does not purport to prohibit action

for damages, or otherwise, as to any nuisance which may be created and established." We agree. There is no question that property will be taken for ditches, drains, etc., in the construction of the system, and the evidence shows that the district is presently making a title search and has retained appraisers to determine the value of the property to be taken. There is nothing in the record to indicate that the district proposes to take any land without compensation. The argument is made:

"As we read the record and the plans, the sewerage district makes no provisions for the 'taking of lands' below Leedle's mill which is just south of the north line of Rock county. Above that point, they do propose to take some land for widening of the Badfish creek so as to take care of the increased flow down to that point, but they propose to just let it run from that point on down. There will be much flooding below that point and there will be the nuisance damage beyond that point which the appellants and owners of like property will have to show. It is readily apparent that this would be impossible to do within six months after the completion of the project."

If the situation anticipated by the appellants does arise, they will have their remedy in a proper action. Sec. 144.05 (2) is a statute of limitations affecting only such causes of action as may arise from a taking incident to construction, not operation, of the diversion system. In any event, the appellants are in no position to question the constitutionality of the section, since the facts upon which they base their assertion are purely hypothetical. *United G., C. & C. Workers v. Wisconsin E. R. Board* (1949), 255 Wis. 154, 38 N. W. (2d) 692, 340 U. S. 903, 71 Sup. Ct. 283, 95 L. Ed. 653.

Complaint is made that the committee erred in refusing to admit testimony as to conditions on the Madison lakes in the summer of 1955. From the offer of proof made it was apparent that the evidence would bear only upon the question of need for diversion. Such evidence would be wholly irrelevant and immaterial, the statute requiring diversion having

been held valid in the *Madison Metropolitan Sewerage Dist. Case, supra.*

Irregularities in procedure before the committee are also complained of in that respondent permitted the introduction of certain records of prior proceedings and a document denominated "Abridgement of Material Testimony" which appellants argue incorrectly or inadequately presented the facts. Suffice it to say that there is no showing that appellants made any objections to the introduction of this material, but availed themselves of it when its use served their cause. They cannot now raise the question.

Appellants contend that the orders of the committee are not supported by substantial evidence in view of the entire record.

The evidence shows that originally fourteen different diversion routes were considered and that the choice was finally narrowed down to two, the Badfish route and the so-called Yahara route; and Mr. Hunt, a consulting engineer of long experience and familiarity with the problem, testified that the Badfish route was chosen in view of a number of circumstances such as economy of construction, engineering problems, swiftness of the stream, and aeration possibilities. While he would not say that no nuisance would be created on the Badfish route, it was his considered judgment that it was the route with the least possible chances of nuisance. As pointed out in the *Madison Metropolitan Sewerage Dist. Case, supra,* the evidence is that the discharge of effluent into moving streams does not produce the algal-nuisance conditions that result from such fertilization of static waters. From the high point along the proposed route, over which the effluent will be pumped, to the mouth of the Badfish creek at the Yahara river, there is an average fall of 8.5 feet per mile; below that the fall is five to six feet per mile—facts which would qualify these waters as rapidly moving. Advance sets of the final plans submitted to the state board of health show that provision is made for chlorination and aeration at points

along the route where preliminary studies have indicated the necessity therefor.

The orders are supported by the evidence. In *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 405, 406, 34 N. W. (2d) 238, it was held that sec. 227.20 (1) (d), Stats., providing that administrative decisions may be reversed or modified if "unsupported by substantial evidence in view of the entire record as submitted," means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " In our opinion, the evidence upon which the committee based the orders under review fully meets such test.

Some argument is made that the proposed diversion will have an adverse effect on the Yahara river because of reduction in stream flow resulting in loss of power. Appellants are not in a position to make such contention since obviously their rights are not involved.

It is also contended that recreational use of Badfish creek will cease. While there is some evidence that it has been used as a trout stream, it was shown that it has to be artificially stocked and is rated as a C-minus trout stream by the conservation department.

It is contended that the proposed diversion will take the effluent entirely out of its natural drainage basin and appellants cite *Winchell v. Waukesha* (1901), 110 Wis. 101, 107, 85 N. W. 668, to the effect that "The general authority to municipalities to construct sewer systems is a direct legislative authority to use the natural drainage courses, since in no other manner can the outflow be dismissed." The argument is immaterial. No surface waters will be diverted from one watershed to another; the waters carrying the effluent come from artesian wells. In any event, the legislative directive in sec. 144.05 (1), Stats., is that the district by-pass the Madison lakes in the discharge of its effluent and the question of its validity is settled. The *Winchell Case* held that the use

of streams for the disposal of sewage is for the legislature to decide.

It would serve no purpose to discuss at length appellants' arguments that farmers watering their stock in the Badfish will be taken off the Grade A milk market, that good farmland will be needlessly flooded and that algal-nuisance conditions will be created in the Rock river. All such contentions are based on speculation. As pointed out above, if these imaginary conditions materialize into actuality, persons damaged thereby may establish the facts in a proper action.

Finally, there is the contention that if the proposed diversion will create nuisances, it cannot be approved under sec. 144.51 (4), Stats. The section provides:

" 'Pollution' includes contaminating or rendering unclean or impure the waters of the state, or making the same injurious to public health, harmful for commercial or recreational use, or deleterious to fish, bird, animal, or plant life."

This section merely defines the meaning to be given to the word "pollution" where it is used in the statutes. Such a statute cannot, nor was it intended to, override the specific provisions of sec. 144.51 (1), and we see no conflict between them. The legislature recognizes that the discharge of treated wastes into surface waters involves some degree of pollution. Sub. (4) cannot be interpreted as prohibiting pollution. The problem of sewage disposal is, for the most part, one of control of pollution, as a reading of sec. 144.53 will show, rather than prohibition. It is the committee's duty to enforce such measures and practices as will safeguard the public health and suppress, so far as advances in science make possible, all undesirable side effects of a situation which civilization imposes on the public. We must assume it will carry out such duties.

As industrial and urban communities grow, the need to dispose of wastes necessarily invades the property rights of more and more people and subjects them to conditions involving some degree of personal revulsion. This is unavoid-

able, but, as pointed out in *Borough of Westville v. Whitney Home Builders* (N. J. 1956), 122 Atl. (2d) 233, 243, where sewage effluent was discharged into a stream which ran into a pond in a public park:

"We by no means make light of plaintiff's grievance. The problem presented has impressed us as of considerable import. As conceded by the trial court the people of Westville cannot be expected to be happy over the continous presence of sewage effluent in their park pond, no matter how relatively pure. . . . Initial public revulsion, if present, may or may not give way to acceptance of a situation which eventualities prove to involve no unpleasantness or actual harm. On the contrary, unpleasantness or harm may arise. Only time can tell."

All of appellants' contentions are premature, based on eventualities which have not yet arisen and may never arise. The judgment must be affirmed.

*By the Court.*—Judgment affirmed.