WARSHAFSKY, by Guardian *ad litem,* and another, Respondents, v. THE JOURNAL COMPANY and another, Appellants.

*No. 273. Argued January 3, 1974.—Decided April 2, 1974.*
(Also reported in 216 N. W. 2d 197.)

132

134

For the appellants there were briefs by *James P. Brody, Robert A. Christensen* and *Foley & Lardner,* all of Milwaukee, attorneys for The Journal Company; and *Robert W. Warren,* attorney general, and *Gordon Samuelsen,* assistant attorney general, attorneys for the Department of Industry, Labor & Human Relations; and oral argument by *Mr. Christensen* for The Journal Company, and *Mr. Samuelsen* for the Department of Industry, Labor & Human Relations.

For the respondents there was a brief by *Warshafsky, Rotter & Tarnoff, S. C.,* attorneys, and *Alan E. Gesler* of counsel, all of Milwaukee, and oral argument by *Mr. Gesler.*

HANLEY, J.   The following issues arise on appeal:

1.  Is sec. 103.23, Stats., violative of the equal protection clause of the fourteenth amendment of the United States Constitution?

2.  Is sec. 103.23, Stats., in conflict with Title VII of the Civil Rights Act of 1964 and thus superseded by Title VII by virtue of the supremacy clause?

Child labor laws such as sec. 103.23, Stats., had their advent in the late 19th and early 20th Centuries.[3] Such laws were enacted so as to protect the child from the dangerous and deplorable working conditions which children were being subjected to at that time.  Such protective legislation has withstood constitutional challenges [4]

---

[3] Sec. 103.23, Stats., was created by ch. 401, Laws of 1937.

[4] *Prince v. Massachusetts* (1944), 321 U. S. 158, 64 Sup. Ct. 438, 88 L. Ed. 645; *Green v. Appleton Woolen Mills* (1916), 162 Wis. 145, 155 N. W. 958.

and has been held to be a lawful exercise of the state's inherent power to protect the health, safety and morals of its juveniles.

"The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, and the possible harms arising from other activities subject to all the diverse influences of the street. It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action." [5]

Child labor laws have generally applied equally to minor males and females. Labor practices and working conditions which were dangerous to one sex were equally dangerous to the other sex. Such was not the case, however, as to legislation limiting the employment of minors in "street trade" occupations. Therein the legislature felt that the possibility of physical or psychological injury to minor females was greater than to minor males. Thus, minor females were restricted from such employment until the age of eighteen whereas minor males were only so restricted to the age of thirteen. [6]

At trial and on appeal the respondents do not challenge the state's right to protect its minors from economic exploitation and similar dangers arising out of employment. The respondents do, however, contend that the

---

[5] *Prince v. Massachusetts, supra,* at pages 168, 169.

[6] Sec. 103.23, Stats. 1939. Sec. 103.23, Stats., was amended by Laws of 1971, ch. 271, sec. 5, which lowered the minimum age for employment of minor males to twelve.

state may not unequally apply that power to its minors of different sexes. It is this legislative classification and not the state's power to protect the health, safety and morals of its juveniles that the respondents have challenged as being violative of the equal protection clause of the fourteenth amendment and Title VII of the Civil Rights Act of 1964.

*Equal protection.*

Sec. 103.23, Stats., is challenged as being violative of the equal protection clause of the fourteenth amendment of the United States Constitution in that it proscribes the employment of minor females in "street trade" occupations but does not impose a comparable limitation on minor males. The threshold question to be determined by this court is what constitutional standard of review should be applied to a law that denies employment opportunities on the basis of sex.

Courts have promulgated tests to be applied in reviewing legislative classifications under the equal protection clause—*i.e.,* the traditional test and the suspect classification test. Under the "traditional" equal protection analysis a legislative classification must be sustained unless it is "patently arbitrary" and bears no rational relationship to a legislative governmental interest. *Frontiero v. Richardson* (1973), 411 U. S. 677, 93 Sup. Ct. 1764, 36 L. Ed. 2d 583; *McGowan v. Maryland* (1961), 366 U. S. 420, 426, 81 Sup. Ct. 1101, 6 L. Ed. 2d 393; *State v. Mertes* (1973), 60 Wis. 2d 414, 210 N. W. 2d 741. This standard of review is generally applied in scrutinizing economic regulations. If, however, the legislative classification is based upon race, alienage, national origin, or as the respondents contend, sex or if the classification touches upon a fundamental interest,[7] then the legislative

---

[7] *Shapiro v. Thompson* (1969), 394 U. S. 618, 634, 89 Sup. Ct. 1332, 22 L. Ed. 2d 600; *State v. Yoder* (1971), 49 Wis. 2d 430, 434, 182 N. W. 2d 539.

classification must "bear a far heavier burden of justification" [8] and is invalid in absence of an "overriding statutory purpose." [9]

Historically the courts have applied the "rational relationship" test in determining whether classifications based on sex are violative of the equal protection clause. *Muller v. Oregon* (1908), 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551; *Hoyt v. Florida* (1961), 368 U. S. 57, 82 Sup. Ct. 159, 7 L. Ed. 2d 118.

Recently, however, courts have taken a closer look at such classifications based upon sex which shackle women with economic subservience and have taken appropriate remedies to aleviate this situation.

"An analysis of classifications which the Supreme Court has previously designated as suspect reveals why sex is properly placed among them. . . .

"Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. [citations omitted] The result is that the whole class is relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members. [citations omitted] Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based on that characteristic lest outdated social stereotypes result in invidious laws or practices." [10]

The United States Supreme Court has re-evaluated its position concerning the legal status of women in con-

---

[8] *McLaughlin v. Florida* (1964), 379 U. S. 184, 85 Sup. Ct. 283, 13 L. Ed. 2d 222.

[9] *Id.* at page 192.

[10] *Sail'er Inn, Inc. v. Kirby* (1971), 5 Cal. 3d 1, 18, 95 Cal. Rptr. 329, 485 Pac. 2d 529, 540.

temporary society. In *Reed v. Reed* [11] the court held an Idaho statute which provided that men be granted preference over women as administrators of probate estates to be violative of the equal protection clause of the fourteenth amendment. Applying the traditional "rational relationship" test the court determined the statute to be arbitrary and unconstitutional.

In *Frontiero v. Richardson, supra,* the court held federal statutes which prescribed different tests for "dependency" for the purpose of obtaining increased quarters allowance and medical and dental benefits for male and female members of the "uniformed services" to be violative of the fourteenth amendment and unconstitutional. Reasoning that the effect of such an historic "romantic paternalism" approach was to "put women not on a pedestal, but in a cage," [12] a minority of four justices (BRENNAN, DOUGLAS, WHITE and MARSHALL) found that the statutory classification based upon sex was "inherently suspect."

"With these considerations in mind, we can only conclude that classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny. Applying the analysis mandated by that stricter standard of review, it is clear that the statutory scheme now before us is constitutionally invalid." [13]

Three members of the court (Chief Justice BURGER, Justices BLACKMUN and POWELL) concurred in the opinion but found the classification of sex as a suspect classification to be premature. Mr. Justice STEWART concurred, citing *Reed v. Reed* and Mr. Justice REHNQUIST dissented.

[11] (1971), 404 U. S. 71, 92 Sup. Ct. 251, 30 L. Ed. 2d 225.

[12] *Frontiero v. Richardson, supra,* page 684.

[13] *Id.* page 688.

The obvious reluctance of the United States Supreme Court to categorize sex as an inherently suspect classification as evidenced in *Frontiero* arises from an unwillingness to intrude into the area while the equal rights amendment is pending ratification by the states.[14]

This court is also reluctant to deviate from the traditional test of upholding a legislative classification unless said classification is patently arbitrary and bears no rational relationship to a legitimate governmental interest in the instant action.

While the classifications herein are made on the basis of sex and while this court is loath to condone the continuance of sexual discrimination, it is the opinion of this court that sec. 103.23, Stats., constitutes a reasonable legislative attempt to protect the well-being of its minor female citizens and is inviolate of the juvenile's rights. While equality of treatment under the law is an oft sought and much cherished right, the protection of the health, safety and morals of children is of paramount importance.

The evidence educed in the instant action is uncontested. Such evidence effectively establishes the character of the work of paper carriers in general and those of The Journal Company in particular. Harold Stolberg, city circulation manager for The Journal Company, established that The Milwaukee Sentinel is made available to its carriers at approximately 5 a. m. each morning. The carriers then assemble and bag their own papers at the distribution point and generally complete delivery of those papers by 6:30 a. m. Carriers of The Milwaukee Journal, on the other hand, receive their weekly papers at approximately 3:30 p. m. and must complete delivery by 5:30 p. m. The availability and delivery of the Sunday Milwaukee Journal is similar to that of The Milwaukee Sentinel.

[14] *Wiesenfeld v. Secretary of Health, Education and Welfare* (D. C. N. J. 1973), 367 Fed. Supp. 981.

The paper route carriers are totally unsupervised by The Journal Company when making their daily deliveries. This lack of supervision makes the carriers excessively susceptible to criminal attacks. Consistently, the paper carrier enters and leaves a specific building or neighborhood at the same time daily. Despite conditions of darkness and in spite of all kinds of weather, the paper carrier can be expected to perform his duties anywhere in the greater Milwaukee area with clockwork regularity. Such an unsupervised and consistent delivery schedule makes a criminal attack relatively simple for even the novice of criminals.

The paper carrier is likewise exposed to criminal attack during his weekly or monthly collection. At that time—generally in the early evening—the carrier must retrace his steps over his route and, while unsupervised, present himself at the door of each customer in an attempt to receive payment.

It was additionally established that, as a result of such working conditions, carriers have been physically assaulted and robbed. The rising criminal statistics for greater Milwaukee and the state of Wisconsin effectively bear out such occurrences. Fortunately, to date, no Journal carrier has been sexually molested. If, however, minor girls were permitted to be employed as paper carriers, the results would undoubtedly not be so fortunate.

While rape is undoubtedly one of the most under-reported crimes because of the fear and embarrassment resulting therefrom,[15] the numerical increase in its occurrence is alarming. From 1970 to 1972 there were 13 cases of rape involving minor female victims in Dane county alone. Additionally, during the same period there

---

[15.] Wisconsin Criminal Justice Information, Crime and Arrests —1973, p. 72.

were 11 cases of indecent behavior and 45 cases of indecent exposure committed against minors in the city of Madison. In the first nine months of 1973 the number of reported forcible rapes in Milwaukee increased by 91 percent and in the state by 28 percent. These facts were before the legislature when it recently re-established its proscription of the employment of minor females in "street trade" occupations.[16]

Rape is similarly a crime of unequaled destruction. Such was the opinion of Dr. James J. Balistrieri, a child phychiatrist. The psychological and and physiological impact on a young girl which results from rape need not be developed herein. Suffice it to say that the legislature has a legitimate interest in protecting its minor female citizens from ever-increasing dangers of sexual assault.

In the light of such evidence, it is the opinion of this court that sec. 103.23, Stats., constitutes a lawful exercise of legislative power and is inviolate of the equal protection clause. The principle of protecting the health and well-being of its juveniles is herein controlling. While the principles of sexual equality—like the principle of religious freedom in *Prince*—are of constitutional dimension, such principles must give way when encountered by reasonable state legislation for protection of the well-being of its juveniles.

### Title VII of the 1964 Civil Rights Act.

In order for a state statute such as sec. 103.23, Stats., to be superseded by federal legislation, such federal legisla-

[16] Laws of 1971, ch. 271, sec. 5.

This court has long had the rule that the courts of Wisconsin must assume that the legislature found all the facts that can reasonably be conceived of to support the statute. *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 254, 50 N. W. 2d 424, quoted in *Madison v. Chicago, M., St. P. & P. RR. Co.* (1958), 2 Wis. 2d 467, 473, 87 N. W. 2d 251.

tion must either have pre-empted the field from state legislation or be interfered with by state legislation.

". . . The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail. Article VI, Clause 2. This principle was made clear by Chief Justice Marshall when he stated for the Court that any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." [17]

Thus, the initial question is whether sec. 103.23 is pre-empted by or is in conflict with Title VII of the Civil Rights Act of 1964.

In enacting Title VII of the Civil Rights Act of 1964, Congress did not intend to pre-empt all state employment laws. The antipre-emption statute provides:

"Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." [18]

Neither, however, did Congress intend to sanction compliance with any state protective law which would result in an unlawful employment practice. Sec. 2000e–7, *supra.* This point has been expressed by the courts. [19] Thus, in order to determine whether sec. 103.23, Stats., is in conflict with Title VII of the Civil Rights Act of 1964, the following questions must be answered:

---

[17] *Free v. Bland* (1962), 369 U. S. 663, 666, 82 Sup. Ct. 1089, 8 L. Ed. 2d 180.

[18] 42 U. S. C. sec. 2000e–7.

[19] *See Rosenfeld v. Southern Pacific Co.* (9th Cir. 1971), 444 Fed. 2d 1219; *Sail'er Inn, Inc., supra.*

a. Does sec. 103.23, Stats., as applies to women as a class mandate an unlawful employment practice on the part of the employer?

b. Is Title VII equally applicable to minor females?

c. Does sec. 103.23, Stats., constitute a bona fide occupational qualification?

*Sec. 103.23, Stats., on question of unlawful mandate.*

Title VII of the Civil Rights Act of 1964 was enacted in response to the social and economic injustices suffered by women and other minority groups in employment. Title VII attempted to insure through legislative action that persons of like qualifications would be given equal employment opportunities irrespective of their sex.

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." [20]

This policy of nondiscrimination as mandated by Title VII "requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group." 29 C. F. R. sec. 1604.1 (a) (ii). This policy can be implemented only if each individual, otherwise entitled to the position, is afforded an opportunity to demonstrate that he or she has the capacity to perform the work. *See Rosenfeld v. Southern Pacific Co., supra; Bowe v. Colgate-Palmolive Co.* (7th Cir. 1969), 416 Fed. 2d 711.

Sec. 103.23, Stats., adopts an approach different from Title VII's reliance upon the applicant's individual capabilities. This state's legislature deems that all individuals included therein are incapable of performing, because

---

[20] 42 U. S. C. sec. 2000e–2 (a) (1).

of employment dangers, the functions of the job. While the rationale behind the differing approaches of the federal and state legislation is evident—federal legislation is directed towards protection of the individual's employment opportunities whereas state legislation is directed towards protection of the safety of its citizens— such a rationale may not provide the basis for upholding state legislation in light of countervailing federal law. 42 U.S.C. 2000e–7; *Free v. Bland, supra,* page 666.

While the rationale behind sec. 103.23, Stats., is salutary, such a rationale could not provide the basis for upholding the statute in light of countervailing federal law. If, for example, sec. 103.23 were applicable to adult females and not minor females, said statute would constitute an unlawful employment practice by requiring employers to discriminate against women as a class without affording them the opportunity to individually demonstrate their qualifications for such employment and thus be superseded by Title VII of the 1964 Civil Rights Act.

*Is Title VII equally applicable to minors.*

Since sec. 103.23, Stats., applies only to the employment of minor females in "street trade" occupations, it is necessary to determine whether or not the proscription of Title VII of sex discrimination in employment is equally applicable to juveniles. If Title VII can be found not to apply to minor females, and since sec. 103.23 constitutes a valid state interest in protecting the health, safety and morals of its juveniles, then such legislation is not in conflict and superseded by Title VII of the Civil Rights Act of 1964 by virtue of the supremacy clause.

The Civil Rights Act of 1964 arose out of the widespread public indignation of the invidious discrimination suffered by racial minorities in America. Discriminatory practices which existed in the areas of education, public

accommodations, voting and employment were proscribed therein and the exercise of those fundamental rights guaranteed thereby.

One specific aspect of the Civil Rights Act of 1964 was the proscription of discriminatory practices in employment. 42 U.S.C. 2000e. As first introduced, however, such legislation was limited to the proscription of discrimination on the basis of race, color, religion or national origin. Such discrimination was then prevalent and to a lesser degree still exists. Congress apparently determined there existed no acceptable basis upon which to discriminate between individuals of differing races— either adult or juvenile. Such practices were deemed unlawful.

The prohibition of sex as a basis of discrimination was, on the other hand, not included in the initial draft of Title VII. The prohibition of discrimination on the basis of sex rather found its genesis in a later amendment to the act. Similarly, Congress determined that sexual discrimination differed from discrimination on the basis of race. Thus specific employment practices in those areas where sex is reasonably necessary to the normal operation of that business or enterprise was exempted from coverage under Title VII. 42 U.S.C. sec. 2000e-2 (a) (1).

Such congressional action as is evidenced by the later addition of sex as a proscribed discriminatory practice and its limitation in scope to those areas where sex is not reasonably necessary to the normal operation of a business or enterprise convinces this court that Congress did not intend that its prohibition of sex discrimination be interpreted as broadly as its prohibitions of racial and other discriminations. While there exists no rational basis upon which a state may limit the employment opportunities of minors of differing racial backgrounds, the same cannot be said concerning minors of differing sexes.

We have reviewed the legislative history of Title VII as it applies to sexual discrimination and have found no evidence that Congress intended to limit in any fashion the historically valid state interest in protecting the health, safety and morals of its juveniles. *Prince v. Massachusetts, supra.* Such a radical change in the law will not be presumed absent some explicit indication that Congress had intended such a result.

It is the opinion of this court, evidenced by congressional actions as to its proscription of sexual discriminations, that the state interest in protecting the health, safety and morals of its juveniles has not been negated. The E. E. O. C. guidelines as applying to state laws which provide for the differing treatment for minors of opposite sexes compel no contrary result.

"(2) The Commission has concluded that State laws and regulations which discriminate on the basis of sex with regard to the employment of minors are in conflict with and are superseded by title VII to the extent that such laws are more restrictive for one sex. Accordingly, *restrictions on the employment of minors of one sex over and above those imposed on minors of the other sex will not be considered a defense to an otherwise established unlawful employment practice* or as a basis for the application of the bona fide occupational qualification exception." (Emphasis supplied.) [21]

While such guidelines are to be given great deference by the courts in interpreting Title VII, *Griggs v. Duke Power Co.* (1971), 401 U. S. 424, 434, 91 Sup. Ct. 849, 28 L. Ed. 2d 158, the administrative agencies have no power to declare state laws unconstitutional. Determinations as to the interpretation and constitutionality of statutes is still exclusively vested in the courts. *Williams v. Madison* (1962), 15 Wis. 2d 430, 113 N. W. 2d 395. The jurisdiction of the E. E. O. C. is limited solely to

[21] 29 C. F. R. sec. 1604.2 (b) (2).

proceedings before that agency in determining whether there has been a violation of federal law. Thus, while this court recognizes the expertise exercised by the E. E. O. C. in its interpretation and application of Title VII, it is our opinion that 29 C. F. R. 1604.2 (b) (2) as it applies to state protective laws of juveniles in general and sec. 103.23, Stats., in particular is in error and absent explicit federal precedent to the contrary, will not be deemed to have superseded sec. 103.23, Stats.

*Sec. 103.23, Stats., as a bona fide occupational qualification.*

Since we hold sec. 103.23, Stats., is not superseded by Title VII of the 1964 Civil Rights Act, we do not reach the question of whether sec. 103.23 constitutes a bona fide occupational qualification under 42 U.S.C., sec. 2000e–2 (e) (1).

*By the Court.*—Judgment reversed and cause remanded with directions to dismiss the complaint.